

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JUL 2 8 2016
*Madsen, Q. J.*
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on July 28, 2016

*Susan L Carlson*
**Supreme Court Clerk**

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parental Rights to B.P. (DOB 7/8/11) | NO. 91925-9 |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL & HEALTH SERVICES, | EN BANC |
| Respondent, | Filed ___ JUL 2 8 2016 ___ |
| v. | |
| H.O. (Mother), | |
| Petitioner. | |

GORDON McCLOUD, J.—Petitioner H.O. asks us to reverse the Court of Appeals' decision affirming the termination of her parental rights. She argues that the State failed to prove two prerequisites to termination, one statutory and one constitutional. The statutory prerequisite is codified at RCW 13.34.180(1)(d); it requires the State to prove that it has offered and provided "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." The constitutional prerequisite is a finding (express or implied) of parental unfitness. We agree with H.O. that the State failed to prove the first

prerequisite by the necessary evidentiary standard (clear, cogent, and convincing evidence). We therefore reverse the Court of Appeals and reverse the order terminating H.O.'s parental rights.[1]

## ISSUE PRESENTED

The mother in this case, H.O., suffered from drug addiction, depression and other mental health issues, and the effects of long term childhood trauma. The child in this case, B.P., suffered as well: she was born addicted to methamphetamine, endured withdrawal, was abandoned by H.O. during infancy, and experienced multiple disruptions when forming attachments with H.O. and various foster parents. On the other hand, after several tries, H.O. achieved sobriety; benefited from treatment in a structured environment; and became an attentive and caring mother to another child, A., in that structured environment. She also engaged in partially supervised, therapeutic visitation with B.P., and the two began to form what witnesses at the termination hearing called a social relationship with an emerging emotional attachment.

The significance of this attachment is the central disputed issue in this case. H.O. maintains that B.P. would have formed a stronger attachment to her if the

---

[1] H.O. filed a motion to accept additional evidence on review pursuant to RAP 9.11, which was passed to the merits. We now deny the motion and decline to accept the additional evidence submitted by H.O.

2

Department of Social and Health Services (Department) had fulfilled its duty to provide "necessary services," RCW 13.34.180(1)(d), to facilitate reunification. (It is undisputed that the Department provided B.P.'s foster parents with attachment therapy services.) The Department argues that it fulfilled this obligation but the services were futile. It maintains that the absence of a stronger attachment bond and H.O.'s risk of relapse now make her unfit to parent B.P. The trial court agreed with the Department.

The trial court is certainly in the best position to weigh the evidence presented about H.O.'s fits and starts, B.P.'s needs, and the Department's attempts to fulfill its responsibilities. And if those were the only issues presented by the tragic facts of this case, we would certainly defer to the trial court's judgment.

Our court, however, must resolve a legal question about the framework the trial court should use to make decisions in a parental rights termination hearing.

As discussed above, the legislature mandated that the Department provide all "necessary services" to parents like H.O. to try to move toward the goal of family reunification. RCW 13.34.180(1)(d). The trial court may not terminate a parent's rights unless it determines that the Department fulfilled that duty or that services would be futile. The legislature did not specify how to implement this mandate where, as here, the Department identifies a child's special needs and provides the foster parents, but not the biological parent, with the tools to try to address those

3

needs. But recent precedent from this court and the Court of Appeals has addressed that issue, and we reaffirm that precedent now: where a child has special needs (here, special attachment needs); and where, as here, those special needs are exacerbated by the State's failure to timely provide necessary services to the biological parent; then the State has failed to prove this legislatively mandated prerequisite to termination (absent futility, which was not shown here). See discussion of *In re Welfare of C.S.*, 168 Wn.2d 51, 225 P.3d 953 (2010), and *In re Termination of S.J.*, 162 Wn. App. 873, 256 P.3d 470 (2011), in Part 1 below. Because we adhere to the holdings of *C.S.* and *S.J.*, we reverse the decision of the Court of Appeals.

## FACTS

### 1. Dependency proceedings

Petitioner H.O. gave birth to B.P. on July 8, 2011. Because H.O. was a methamphetamine user throughout her pregnancy, B.P. was born addicted and the hospital placed a "hold" on her. Clerk's Papers (CP) at 180. B.P. was released into foster care July 13, 2011. In August 2011, an order of dependency was entered for B.P. That order and subsequent review orders required H.O. to complete random urinalysis (UA) testing, mental health treatment, chemical dependency evaluation and treatment, hands-on parenting training, therapeutic visitation, and family therapy. H.O. participated in mental health counseling and parenting services, and, in September 2011, B.P. was placed with her at Isabella House, a six-month

4

residential chemical dependency program. Isabella House is a highly structured program: residents follow a regular schedule of chores, group therapy, exercise, and educational classes. Isabella House provides child care while residents participate in these activities. Residents of Isabella House follow a curfew, must sign in and out when they leave the facility, and must get permission to visit with any outsiders. H.O. successfully completed treatment at Isabella House in January 2012 and moved into the organization's "[t]ransition [h]ouse" located next door. CP at 182. The transition house required residents to submit to UAs, observe a curfew, and participate in outpatient treatment and self-help groups.

H.O. relapsed, and B.P. was again removed from her care in July 2012, when B.P. was one year old. H.O. was allowed visitation with B.P. immediately upon her removal, but H.O. frequently arrived high for visits or missed them altogether. The dependency court suspended visitation in October 2012 after H.O. missed 10 scheduled visits and B.P. began displaying aggression and disorganized behavior toward H.O. during the visits she did attend. The court ordered that visitation would not resume unless H.O. obtained another court order reinstating visits. In November 2012, B.P. was placed into her fourth and final foster home, with her paternal aunt and uncle. B.P. did well in this placement, but when there was a change in her routine she showed significant distress. She displayed "disorganized" attachment

behavior and was unable to regulate her emotions. 2 Verbatim Report of Proceedings (RP) at 161 (Feb. 11, 2014).

H.O. became pregnant again in the fall of 2012 and continued to use methamphetamine for most of the pregnancy. The Department filed a petition to terminate H.O.'s parental rights to B.P. When she was eight months pregnant, however, in May 2013, H.O. returned to Isabella House. H.O. gave birth to A. in June 2013, and the Department agreed to an in-home dependency so that A. could remain with H.O. at Isabella House. H.O. remained sober through the time of trial in this case, and A. has never been removed from her care.

In August 2013, H.O. obtained a court order provisionally reinstating visitation with B.P. The order granted her "1 visit in [a] therapeutic setting" and provided that "[a]ny additional visits shall be based upon [the] therapist's [r]eport." Ex. P-11, at 3. In August 2013, H.O. and B.P. had a visit supervised by Lori Eastep, a family therapist. At that point, the termination trial was set for September 16, 2013. Eastep reported that the visit went well, but she found it "contraindicated to begin visitation if the Department is moving toward termination," and recommended at that time that visitation continue only if the State did not intend to seek

termination.[2] 1 RP at 64 (Feb. 10, 2014). On August 28, 2013, the trial court denied

further visitation because the case was proceeding toward termination.

On September 13, 2013, however, the trial court reversed that order and

continued the termination hearing four months, until January 13, 2014. That

continuation order stated, in relevant part:

> 2.1 The parties have shown good cause for a continuance of the
> termination hearing scheduled for September 16, at 9:00 a.m., in that:
> the parties agree that the mother needs to have some visitation *in order
> to determine if the parent child relationship can be repaired.*
>
> The parties agree that the trial should be continued to the first
> available date in January 2014.
>
> Despite the court order entered on August 28, 2013, the mother
> should begin to have weekly therapeutic contact with the child. A
> parenting assessment should also be scheduled for sometime in
> November 2013. After the assessment is completed, the parties should
> hold a staffing to assess the current case plan.

CP at 66 (emphasis added).

As a result of this new order, H.O. had 22 two-hour visits with B.P. between

October 2013 and February 2014, all supervised by Eastep. By November 2013, the

supervised visits occurred twice a week, consistent with the trial court's order. By

---

[2] 1 RP at 65 (Feb. 10, 2014) ("[i]f visitation is only to satisfy a service requirement,
it would be detrimental to [B.P.]'s emotional stability and create placement instability and
possible upset and would not be in the best interest of [B.P.]").

December, Eastep decreased supervision to once a week because H.O. was handling the visits well on her own.

H.O. also progressed in treatment during this time. She successfully completed her treatment program at Isabella House in December 2013 and moved into transitional housing. During her treatment at Isabella House, H.O. committed only one violation of house rules: she accepted a ride from B.P.'s foster father. This violation resulted in H.O.'s spending an additional six weeks at Isabella House, but H.O. self-reported it and continued to test clean afterward.

She therefore moved to continue the termination trial on December 6, 2013. She filed a declaration explaining that she had not yet had sufficient visitation with B.P. and was still seeking stable housing.

Of most relevance to this appeal, H.O.'s declaration stated:

> At this time I feel that I have not had enough one on one time with [B.P.] . . . . [W]hile I understand that [B.P.] could come to [my current transitional housing] and live there with me[,] if I am going to be moving to a more permanent home[] then I think that is where her transition should occur. I think it would be difficult for her to come home to me and then move to a different home. I want to do a transition in a thoughtful and careful manner. I want to be in a stable place so that I can focus on [B.P.] and her needs as she transitions to my care.

> I know that a transition to my care is going to be difficult for [B.P.] I know that I let her down in the past, but I am doing everything that I can to make that right for her. I missed out on a lot of time with her. A lot of that is my responsibility, but there is also some that is the Department's responsibility. At a recent shared planning meeting, our therapist Lori Eastep stated that [B.P.] would not attach to me unless

8

she was forced to do it. My understanding of that is that if she were moved to my care and had to depend on me then she would start attaching to me. *I have also learned, at my family therapy appointment on December 10, 2013 that the foster parents are doing family preservation services with [B.P.] because they have started detaching from her.* This is very distressing to me. At this point I feel that I just need a bit more one on one time with [B.P.] and a more stable home for my daughter to which my daughter can come home.

CP at 81-82 (emphasis added).

In response to H.O.'s report that she discovered the Department was providing family preservation services to the foster parents, but not to H.O., Marcey Monohan, the social worker assigned to B.P.'s dependency, filed a declaration. Monohan denied that B.P. had ever started to detach from her foster parents, but acknowledged that an attachment therapist had been working with the foster family. She explained that this was necessary because "[B.P.]'s ability to form a healthy attachment has been compromised by her mother's relapse and subsequent removal from her care, especially given the important developmental age when this occurred." CP at 90.

At the time of the final dependency review hearing on December 18, 2013, H.O. was compliant with all ordered services and the court ordered her to continue family therapy with Eastep. At the termination hearing, however, Eastep testified that she never provided "family therapy" for H.O.; she instead provided only what she called "therapeutic visits." 1 RP at 67 (Feb. 10, 2014). These were aimed at helping H.O. identify B.P.'s "cues and boundaries" and allowing Eastep to assess

"[B.P.]'s social/emotional relationship with [H.O.] and her sibling, [A.]." *Id.* Eastep distinguished these aspects of the therapeutic visits from "family therapy" and "bonding and attachment work" and testified that she was not a "certified attachment person." *Id.* at 94-95. She also testified that "when you have a young child, you don't ever really do family therapy," but instead help the parent "process[] external . . . and internal factors." *Id.* at 100.

At the time of the termination hearing, H.O. was living in a transitional housing facility with a curfew, random UAs, weekly chore assignments, and various other rules. She had been living there for a little over two months.

### 2. *Termination trial*

Eleven witnesses testified at the termination trial in February 2014, 9 for the State. H.O. and her case manager in the transitional facility testified for H.O. All of the witnesses testified primarily about H.O.'s progress in addiction recovery and B.P.'s potential for attachment with H.O. The State's theory was that H.O. was a fit parent to A., but was unfit to parent B.P. due to B.P.'s potential for developing an attachment disorder. According to the State, H.O. would need to be stable and "in tune with her own emotions" in order to help B.P. grieve the detachment from her foster parents and reattach to H.O. 3 RP at 407 (Feb. 20, 2014). The State maintained that H.O. lacked these qualities, and it argued that B.P. needed permanence immediately or her mental health would be "at great risk." *Id.* at 413.

10

Overall, Eastep testified in positive terms about H.O.'s insight into the facts that (1) she was a stranger to B.P. before visitation began and (2) B.P. would not bond with her solely because she was B.P.'s biological mother. She praised H.O. for preparing well for the visits and asking a lot of good questions about B.P.'s behaviors and needs. She also testified that H.O. was "A[.]'s primary attachment person" and that A. appeared to be "a very healthy, happy little girl." 1 RP at 70, 73 (Feb. 10, 2014).

Eastep's testimony about B.P.'s attachment was more ambiguous: she said that although B.P. had an "emerging emotional connection" with H.O., B.P. did not identify H.O. as her primary attachment person and might never do so. *Id.* at 75. She said that over the four to five months she worked with H.O. and B.P., their relationship had "moments where it . . . improved," but was overall "a bit up and down." *Id.* at 70. She testified that the research on infant attachment shows that it tends to occur at 11 months, and that if a child attaches to another person, "it makes it very difficult from an attachment strategy to change that without forcing it." *Id.* at 71. She explained that no one can be sure which children will have the resilience needed to repair a disrupted attachment with an adult. She opined that it generally takes "hundreds and sometimes thousands of contacts for children to establish a secure attachment," and likened it to the process of a child becoming comfortable with a babysitter over the course of a year or two. *Id.* at 77-79. She also explained

that in order for B.P. to form an attachment to H.O., she would need to sever her attachment to her foster parents. Finally, Eastep explained that when children return home from a foster home where they have formed an attachment, therapists usually recommend ongoing contact with the foster family to help the child handle the transition.[3]

When asked whether B.P. would be able to return to H.O.'s care in the near future, Eastep responded that it was not a "yes/no question." *Id.* at 84. She said that the State would be taking a "calculated risk" by placing B.P. with H.O. because H.O. had not demonstrated the ability to parent a child older than A. and did not have a long track record of sobriety. Ultimately, she recommended a guardianship, in which B.P. would remain with her foster family but H.O. would retain her parental rights. Other parts of her testimony indicate that H.O.'s treating professionals viewed the supervised visits as preparation for B.P.'s possible, eventual return to H.O.'s care. *E.g., id.* at 96 (testifying that H.O.'s individual therapist and counselor encouraged H.O. to bring A. to every supervised visit "because [H.O.] would be parenting both if [B.P.] were to go home").

---

[3] Eastep also testified that she had counseled H.O. to increase her contact with the foster family prior to the termination hearing, so that B.P. could "see them all together functioning that way." 1 RP (Feb. 10, 2014) at 78. In response to this advice, H.O. set up regular playdates with B.P. and her foster parents, prior to the termination hearing, and sought Eastep's advice on how to improve their relationship.

On cross-examination, Eastep acknowledged that she is not certified in attachment work but that evidence-based attachment work is offered in Spokane, where H.O. and B.P. lived.

Carol Thomas, a child therapist and evaluator, testified at length about attachment theory and the consequences of failing to form a secure attachment in infancy. She explained that B.P. had experienced multiple disruptions just as she was forming attachments to H.O. and to various foster parents, and that when a child suffers too many disrupted attachments, that child may "detach completely" and stop trying to connect emotionally or socially. *Id.* at 115. She also testified that she conducted a parenting assessment with H.O., B.P., and A. in November 2013 and determined that B.P. was developing a social relationship with H.O., which lacked any characteristics of an attachment. She said that H.O. "did well" managing both children and responding to their cues. *Id.* at 128. She opined that ending contact between B.P. and H.O. would have a minimal effect on B.P.'s well-being because the two had only a social relationship. She also testified that if B.P. were returned to H.O.'s care, she would be available to provide therapy to help H.O. address B.P.'s disrupted attachment to her foster parents.

Sandra Gormon-Brown, H.O.'s individual therapist, testified that she was helping H.O. address difficult childhood traumas that H.O. endured over a long period of time. She stated that she had "very specific and intensive training in the

13

field of attachment, pediatric trauma and grief," but was working only with H.O., not with H.O. in relation to B.P. or A. *Id.* at 150. Gormon-Brown did not believe that H.O. had any mental health problems that would "impact her ability to have a child that was removed from her care brought back into her care," but also said she was unsure whether H.O. could be sufficiently emotionally available to B.P. to reunify with her. *Id.* at 147. Gormon-Brown testified that she thought B.P. would have more difficulty reuniting with H.O. than H.O. would have reunifying with B.P. She opined that H.O. would need at least another six months of therapy to work through her own trauma. Gormon-Brown acknowledged that H.O. was highly motivated to succeed in therapy and that Gormon-Brown was available to do attachment work with H.O. and B.P. if H.O.'s parental rights were not terminated.

Amanda Clemons, a therapist specializing in family therapy and attachment services, testified that she had contracted with the Department to assist B.P.'s foster family "in terms of attachment and . . . meeting [B.P.]'s needs." 2 RP at 159 (Feb. 11, 2014). At the time Clemons testified (February 11, 2014), she had been providing this assistance two to three times per month for about four months. Clemons stated that B.P. generally exhibited a secure attachment to her foster parents, but that during three of eight total sessions, B.P. demonstrated "disorganized" attachment. *Id.* at 161. According to Clemons, this disorganized behavior always corresponded to some change in B.P.'s routine, including visitation

with H.O. She opined that this indicated B.P. had difficulty handling change, that B.P. needed stability, and that this was attributable to the multiple caregiving disruptions B.P. endured during the first months of her life. Clemons explained that the "first three years are critical" for attachment. *Id.* at 162. She opined that B.P. was at risk for developing an attachment disorder and that it would not be in B.P.'s best interests to experience another disruption. Clemons testified that she could be doing attachment work with H.O. and B.P., but had not received a referral to do such work. She also testified that healthy attachments generally make it easier for children to handle transitions, but that B.P.'s attachment to her foster parents was "not very healthy based on the disruptions." *Id.* at 168-69. She also predicted that the attachment work she had done with the foster parents would make it "even more difficult" for B.P. to endure yet another disruption. *Id.* at 168.

B.P.'s and A.'s guardian ad litem, Karen Schweigert, testified that H.O. was a remarkably attentive mother when B.P. was returned to her care at Isabella House from fall 2011 to spring 2012. Schweigert recalled that during this period H.O. was able to get B.P. "onto a nursing-on-demand schedule, which took an unbelievable amount of dedication and patience." *Id.* at 223. She also testified that B.P. appeared more stressed and less happy when she and H.O. moved out of Isabella House and into the less structured transitional housing, and that when H.O. relapsed and B.P. was removed from her care, the change was "horrifying for this little girl." *Id.* at

15

226. Schweigert described B.P.'s behavior since that time as changing from "meltdowns," so serious that her caregivers suspected a medical cause, to "happy, healthy" behavior that seems "[d]evelopmentally . . . on track." *Id.* at 228, 230. She continued, however, that by December 2012, H.O. had stopped returning her calls, making it difficult for Schweigert to schedule visits with H.O. and A., and that H.O. had also started lying to her. She opined that H.O. was a "really good mother," but only when she was sober and "under a microscope." *Id.* at 240. Schweigert stated that she did not think H.O. was capable of putting B.P.'s needs above her own, providing a consistent schedule for B.P., or reading B.P.'s emotional cues. She opined that it was unlikely B.P. would be able to reattach to H.O., "especially without significant trauma," but also admitted that she had not seen H.O. and B.P. together since August 2013. *Id.* at 245. She also acknowledged that B.P. might reattach to H.O. if she were returned to H.O. full time because "anything is possible." *Id.* at 246.

Kolleen Seward, H.O.'s chemical dependency treatment counselor, testified that H.O. began intensive outpatient drug treatment with Seward's organization, Partners with Families and Children (Partners), in December 2013. She explained that Partners requires participants in intensive outpatient treatment to come to three group therapy sessions per week, one or two individual sessions per month, and two outside support meetings per week. She stated that the purpose of the outside group

requirement was to help participants build "clean and sober peer support network[s]," and that participants can, if they choose, fulfill half of the requirement by attending one church service per week. *Id.* at 172. The other group meeting must be "something surrounding recovery." *Id.* at 176. She stated that H.O. had not verified her participation in the outside group meetings, but also said she had no current concerns about H.O.'s recovery.

Carla Paullin, who provided H.O. with weekly one-on-one chemical dependency therapy from October 2011 until July 2012, testified to H.O.'s history of childhood abuse, criminal activity and incarceration, failed relationships, depression, and drug addiction. She testified that although she had not seen a psychiatric evaluation of H.O., she felt H.O. had "personality disorder traits" and "due to the time she'd spent incarcerated . . . some antisocial stuff." *Id.* at 188-89, 194. She also opined that H.O. was "institutionalized" and that she did well in Isabella House's highly structured environment but "f[e]ll apart" when she graduated and moved to the less structured transition house. *Id.* at 191. Paullin opined that someone with H.O.'s history of drug abuse would probably need two years of structured "wrap-around" treatment therapy before she would "feel good" about H.O.'s prospects for continued sobriety. *Id.* at 198. She also indicated that that type of therapy was not available in Spokane. Paullin also opined that a support

17

network would be crucial to H.O.'s sobriety outside a structured living situation. Finally, Paullin admitted that she had not worked with H.O. since July 2012.

Marcey Monohan, the social worker assigned to monitor B.P.'s dependency, testified that she was surprised to hear Eastep say she had not provided family therapy for B.P. and H.O. Monohan said that the Department had used Eastep for family therapy referrals in other cases and that Eastep's reports for H.O.'s case indicated to Monohan that Eastep was providing what the Department regarded as typical "family therapy." *Id.* at 274. Monohan described A. as a happy and expressive baby who was developmentally on track; she said that H.O. was patient with B.P. during the visits that Monohan observed. But she also said that B.P. was anxious and confused around H.O. during visits. Monohan opined that B.P. could not be safely returned to H.O.'s care at that time because H.O.'s substance abuse and mental health were still concerns "in regards to her ability to be emotionally available for a child like [B.P.]." *Id.* at 275. She said that she did not think H.O. understood the nature of the trauma her relapse had caused B.P. She testified that when she asked H.O. whether she had any insight into what the visitation process was like for B.P., H.O said, "'I don't know how to answer that question. I don't know what you want me to say.'" *Id.* at 280. Monohan expressed concern that H.O. had not verified her participation in all of the chemical dependency group work that Partners required because a similar failure had preceded H.O.'s prior relapse. She

18

said that H.O. would need to demonstrate 18 months to 2 years of sobriety before Monohan would be comfortable that H.O. was in solid recovery. Finally, Monohan opined that B.P. did not treat H.O. like a mother, that B.P. could not wait any longer for permanent stability, and that H.O.'s legal parenthood was a barrier to that stability. On cross-examination, Monohan admitted that she had not seen H.O. and B.P. together since late December (about seven weeks before her testimony).

Paige Beerbohm, a licensed chemical dependency counselor employed at Isabella House, testified that at the time of trial H.O. was in "early recovery" from her addiction, meaning that she had not yet demonstrated an ability to sustain her sobriety. 1 RP at 35 (Feb. 10, 2014). She said that she was not aware of any period of time during B.P.'s life that H.O. was able to sustain sobriety in an unstructured setting. But Beerbohm also testified that she had worked hard to create a better treatment plan for H.O. during her second stay at Isabella House and that H.O. appeared to be "much more open, . . . willing, . . . [and] honest" about treatment than during her first stay. *Id.* at 43. Beerbohm said she did not have any current concerns about H.O.'s sobriety.

Amber Eggert, H.O.'s case manager in the transitional housing facility where H.O. lived at the time of trial, testified that H.O. was in compliance with all the facility's rules.

19

Finally, H.O. testified that she received different and much better treatment at Isabella House during her second stay than she received during her first stay. She also testified that she was approaching her treatment differently this time, with more active engagement and dedication. She explained that she had attended every outside group support meeting that Partners required, but had documented only half the meetings because she was confused about whether one of the meetings she was regularly attending counted as "church" or treatment. 3 RP at 367 (Feb. 13, 2014). She said that she had cleared up the misunderstanding with her treatment provider.

H.O. continued that she had a strong support network of relatives, including her father, and friends from church. She described her relationship with B.P. as improving as their visits continued. She said that she could not completely understand what B.P. had experienced due to her relapse, but knew she had caused hurt and confusion for B.P. H.O. believed that she could address B.P.'s problems because she loved her, was committed to fixing their relationship, and knew that the best place for B.P. was with her sister and mother. She acknowledged the testimony regarding the risks that reunification posed for B.P.'s emotional development, but testified that she thought "those were all things that could change if services like attachment therapy had been something that [Ms. Clemons] had been working on with me and not the foster family." *Id.* at 383.

The trial court terminated H.O.'s parental rights to B.P. Of most significance to this appeal, the trial court found that

> all necessary services, reasonably available, capable of correcting parental deficiencies within the foreseeable future have been offered or provided including: chemical dependency inpatient treatment, outpatient treatment, UA/[blood alcohol] monitoring, individual counseling, parenting assessment, parenting services *including family preservation services* and therapeutic visits with Ms. Eastep in part to address the mother child relationship. . . .
>
>     . . . .
>
>     . . . Ms. Eastep found that while [H.O.] demonstrated insight, . . . she was a stranger to [B.P.] and that her absence created challenges. [H.O.] maintained an adult perspective that [B.P.] would love her because she loved [B.P.]. Ms. Eastep indicated this was not realistic. . . . Ms. Eastep indicated [B.P.] would not form a healthy attachment to [H.O.] without being forced. She also testified that forcing [B.P.] to do this would significantly impact her mental health in a negative manner.
>
>     . . . .
>
>     . . . *The court was concerned about what attachment services were offered to [H.O.]* However . . . [B.P.] was only at a social relationship with [H.O.] at the time of trial, the emotional relationship was just emerging. The court finds that the services necessary to build the type of relationship necessary to meet [B.P.]'s needs would take one year or more and that is too long.
>
>     . . . At the time of trial, [B.P.] was at risk of an attachment disorder.
>
>     . . . .
>
>     . . . The mother is currently unfit to parent [B.P.] . . . [H.O.] is responsible for the stops and starts in her parenting. She does not understand [B.P.]'s needs for permanency or the risk she faces if she

develops an attachment disorder. [H.O.] cannot claim that because [A.] is in her care, that she must be fit to parent. [B.P.]'s needs are different and her attachment issues are the result of her mother's actions. [H.O] has not demonstrated an ability to understand her own feelings, or those of [B.P.] Thus, the Department has established that [H.O.] is currently unfit to parent.

CP at 181-88.

### 3. Appeal

H.O. appealed the termination of her parental rights, assigning error to five of the trial court's factual findings: (1) that all necessary services were expressly and understandably offered or provided to her, (2) that little likelihood existed to remedy conditions so B.P. could be returned to her in the near future, (3) that her continued parent-child relationship diminished B.P.'s prospects for early integration into a stable and permanent home, (4) that terminating her parental rights was in B.P.'s best interests, and (5) that she was unfit to parent B.P. *In re Welfare of B.P.*, 188 Wn. App. 113, 117, 353 P.3d 224 (2015), *review granted*, 184 Wn.2d 1039, 366 P.3d 932 (2016). In this court, H.O. challenges only two of those findings: (1) that all necessary services were offered and provided and (2) that H.O. was currently unfit to parent B.P.

The Court of Appeals affirmed in a split decision. *B.P.*, 188 Wn. App. 113.

ANALYSIS

Before a court can terminate a parent's rights, the State must prove six statutory elements by clear, cogent, and convincing evidence. *In re Dependency of K.D.S.*, 176 Wn.2d 644, 652, 294 P.3d 695 (2013) (citing RCW 13.34.180(1)(a)-(f)). These elements are:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed . . . from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; . . . [and]

. . . .

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). The only statutory prerequisite at issue in this appeal is (d): the provision of all necessary and reasonably available services capable of correcting parental deficiencies.

The other prerequisite to termination at issue in this case is the nonstatutory prerequisite of parental unfitness. The State may not terminate a parent's rights without showing that the parent is currently unfit to parent the child in question. *In re Welfare of A.B.* (*A.B.* I), 168 Wn.2d 908, 918, 232 P.3d 1104 (2010). Terminating a parent's rights in the absence of such a finding, either express or implied, violates due process clause protections. *Id.*; see WASH. CONST. art. I, § 12. The fact of unfitness must also be proved by clear, cogent, and convincing evidence. *Id.* at 919.

In order to prove unfitness, the State must show that the parent's deficiencies make him or her incapable of providing "'basic nurture, health, or safety.'" *In re Welfare of A.B.* (*A.B.* II), 181 Wn. App. 45, 61, 323 P.3d 1062 (2004). Where a trial court finds that the six statutory prerequisites have been met, this constitutes an implicit finding of unfitness. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 577, 257 P.3d 522 (2011).

The trial court's findings of fact in a termination proceeding will not be disturbed so long as they are supported by substantial evidence in the record. *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983). However, because the State must prove its case in a termination proceeding by clear, cogent, and

convincing evidence, that evidence must be "more substantial than in the ordinary civil case in which proof need only be by a preponderance." *Id.* While the record in this case supports certain concerns about H.O.'s parental fitness and amenability to corrective services, those concerns do not amount to clear, cogent, and convincing evidence warranting termination. We therefore reverse the Court of Appeals and reverse the order terminating H.O.'s parental rights.

## THE TRIAL COURT ERRED BY FINDING THAT THE STATE PROVIDED H.O. WITH ALL NECESSARY SERVICES CAPABLE OF CORRECTING PARENTAL DEFICIENCIES

As noted above, before the trial court can terminate a parent's rights, it is required to find that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d). Washington courts have addressed that requirement in two cases that bear striking factual similarities to this one.

In *C.S.*, C.S. was found dependent due to his mother's substance abuse and placed in foster care for the first three years of his life. 168 Wn.2d at 53-54. When C.S. was two, his mother successfully completed an addiction treatment program. *Id.* at 54. Before entering treatment, she also gave birth to a second child. *Id.* at 54 n.1. When C.S. was three, his mother was successfully caring for this second child and had been sober for a year, but the State nevertheless filed a termination petition

as to C.S. *Id.* The trial court terminated the mother's rights, concluding that although she had remedied her only identified parental deficiency, substance abuse, "she lacked 'the patience, presence of mind, skills, experience, time in a day, and availability to care to [C.S.] – given his special needs.'" *Id.* at 55 (alteration in original). C.S. had been diagnosed with ADHD (attention deficit hyperactivity disorder) and several other disorders, and the trial court deemed his mother unfit to parent a child with so many difficulties. *Id.* This court reversed the termination because the State had offered training to C.S.'s foster parents in how to deal with his special needs, but had not offered any such training to C.S.'s mother. *Id.* at 55-56.

In *S.J.*, S.J. was found dependent when he was two and a half. 162 Wn. App. at 876. His mother's parental deficiencies were substance abuse, unsanitary living conditions, and mental health issues. *Id.* Shortly after S.J. was removed from her care, his mother entered treatment for substance abuse but was unsuccessful. *Id.* When S.J. was three, his mother discovered she was pregnant with another child and entered treatment again. *Id.* This time, she was successful enough that the trial court allowed supervised visitation with S.J. *Id.* During these visits, the mother received some parenting education. *Id.* at 876-77. When S.J. was three and a half, his mother graduated from her treatment program and gave birth to her other child. *Id.* at 877. She maintained her sobriety, continued with mental health treatment, and successfully parented her other child. *Id.* When S.J. was four, he began therapeutic

visitation with his mother. *Id.* This went well for a while, but visitation was suspended when S.J. started acting out toward his mother and clinging to his foster parents at visits. *Id.* The State filed a termination petition, and at the hearing, several witnesses testified that the State could have provided S.J. and his mother with bonding and attachment services but failed to do so. *Id.* at 877-78. Witnesses also testified that S.J. was unlikely to develop a healthy relationship with his mother in the near future "due to SJ's entrenched perception of his mother and [her] inability or unwillingness to parent SJ effectively." *Id.* at 879. The Court of Appeals reversed the termination for two related reasons: it found that the State delayed provision of mental health treatment, which might have diminished S.J.'s prospects for bonding with his mother, and it found that the State failed to provide any bonding and attachment services whatsoever. *Id.* at 883-84.

In both of those cases, appellate courts reversed a termination order because the State failed to provide the mothers with training to help them address their child's special needs. *C.S.*, 168 Wn.2d at 53-54; *S.J.*, 162 Wn. App. at 877-78. In *S.J.*, as in H.O.'s case, these special needs arose primarily from the child's separation from his mother and bond with the foster parents, factors that were exacerbated by the State's failure to timely provide necessary services. 162 Wn. App. at 877-78. And in *C.S.*, the State argued—just as it did in H.O.'s case—that services would have been futile because of the mother's substance abuse and mental health problems.

168 Wn.2d at 56 n.2. We rejected this argument because the trial court found the mother had "no lingering deficiency from substance abuse or mental health issues that would preclude her from *caring* for C.S., much less from successfully completing training to do so." *Id.* *C.S.* impliedly holds that the State may not unilaterally decide that an otherwise fit parent lacks the requisite lifestyle or personality traits to benefit from necessary services.[4] Instead, absent a showing that services would be futile,[5] the parent must have the opportunity to benefit from all services available to address a barrier to family reunification.[6]

---

[4] In *C.S.*, the trial court found that the mother lacked "'the patience, presence of mind, skills, experience, time in a day, and availability to care to [C.S.] – given his special needs.'" 168 Wn.2d at 55. We held that the State could not seek termination until it had offered the mother training in addressing C.S.'s special needs. *Id.* at 56 ("Since this training, deemed necessary to address C.S.'s behavioral problems, was not offered to [the mother], termination of her parental rights was not warranted (even if this court assumes arguendo, as the State asserts, that [the mother's] inexperience in addressing C.S.'s conditions can serve as a basis for termination).").

[5] The trial court may make a finding that the Department has offered all reasonable services when "'the record establishes that [an] offer of services would be futile.'" *C.S.*, 168 Wn.2d at 56 n.2 (quoting *Welfare of M.R.H.*, 145 Wn. App. 10, 25, 188 P.3d 510 (2008) (citing *Welfare of Ferguson*, 32 Wn. App. 865, 869-70, 650 P.2d 1118 (1982), *rev'd on other grounds*, 98 Wn.2d 589, 656 P.2d 503 (1983)). But that rule derives from cases in which the State made repeated offers of services but eventually gave up after the parent refused to accept any of those offers. *Id.* In this case, by contrast, the record shows that H.O. accepted every offer of services and did exceptionally well in the therapeutic visits the State provided (the only service the State provided to address the relationship between H.O. and B.P.).

[6] *See C.S.*, 168 Wn.2d at 56 n.3 ("The State is charged with reuniting families where possible and with providing necessary services to achieve that goal. When a 'condition' precludes reunion of parent and child, as here, regardless of whether it can be labeled as a 'parental deficiency,' the State must provide any necessary services to address that

28

In H.O.'s case, the trial court did not make an explicit finding that H.O. had no substance abuse or mental health barriers to parenting. Indeed, the court repeatedly emphasized H.O.'s history of substance abuse and mental health problems.[7] But none of these deficiencies made H.O. unfit to parent A.—the State conceded that H.O. was fit to parent A. and the testimony about her parenting of A. was entirely positive. Thus, there is only one viable interpretation of the trial court's findings on substance abuse and mental health: that H.O. lacked the requisite emotional skills to ensure that attachment services would succeed in the near future. Under *C.S.*, this finding is improper. Absent a showing of futility, H.O. was entitled to any available services necessary to facilitate reunification with B.P. It was not her burden to prove that these services would succeed before the State provided them.

---

condition set forth in RCW 13.34.180(1)(d). Otherwise, the State could avoid providing services to preserve the family unit simply by classifying a parental shortcoming as a 'condition' instead of a parental deficiency.'" (citations omitted)).

[7] *E.g.*, CP at 185-86 ("Given the length of her history and the recent nature of her sobriety, the court could not make a long term legal conclusion about [H.O.]'s sobriety. [H.O.] had not demonstrated any ability to maintain her sobriety outside a structured living environment. . . . [H.O.] also had mental health issues that impacted her ability to parent. [H.O.] has a long trauma history. She does not demonstrate the ability to feel her own feelings. She has not demonstrated the ability to place [B.P.]'s needs above her own. This is a critical skill for a parent.").

Additionally, the record does not support a finding that attachment services would have been futile in this case. Six witnesses testified for the State regarding attachment. Eastep testified that the court would be taking a "calculated risk" by placing B.P. with H.O. 1 RP at 84 (Feb. 10, 2014). Gormon-Brown testified that she didn't know whether H.O. had made enough progress in therapy to be able to successfully "work on . . . attachment strategies," but also stated that H.O. was highly motivated to succeed in therapy and that Gormon-Brown was available to do attachment work with H.O. and B.P. if H.O.'s parental rights were not terminated. *Id.* at 145. Thomas and Clemons testified that another disruption would not be in B.P.'s best interests. But Clemons also testified that she could have been doing attachment work with H.O. and B.P. but had not received a referral to do that work. And Thomas testified that if B.P. were removed from foster care, Thomas would be available to counsel H.O. in how to assist B.P. through the grieving process associated with that disruption. Schweigert, who has no formal education in psychology or attachment issues, opined that it was unlikely B.P. could reattach to H.O. "especially without significant trauma." 2 RP at 245 (Feb. 11, 2014). And Monohan opined that B.P. could not wait any longer for permanent stability.

All of this testimony raises concerns about reunification, some of them grave, but none of it suggests that proper bonding and attachment services were withheld because they would have failed or taken too long. No witness testified to that effect.

Instead, the record indicates that the State never considered offering any attachment services to H.O. at all. It facilitated supervised visitation that resulted, predictably, in what the parenting evaluator described as a "social relationship." 1 RP at 113 (Feb. 10, 2014). The record indicates that Eastep, the therapist who supervised the visitation, was initially confused about the State's goal and recommended *against* continuing visitation unless the goal was *reunification*. *Id.* at 65 ("[i]f visitation is only to satisfy a service requirement, it would be detrimental to [B.P.]'s emotional stability and create placement instability and possible upset and would not be in the best interest of [B.P.]"). After several more weeks of confusion, the trial court finally ordered supervised visitation to continue for another several months "to determine if the parent child relationship can be repaired." CP at 66. Every witness who observed this visitation said that H.O. handled it exceptionally well. But then, after H.O. had faithfully followed every recommendation her therapists made regarding visitation, the State sought termination anyway, offering testimony that H.O. might not have the emotional wherewithal to handle *real* attachment work.

Indeed, the State's position remains fundamentally confused even on appeal. On the one hand, the State argues that attachment and bonding services would have been futile "because H.O. was unable to recognize her own emotions and express them in a healthy way." State of Wash.'s Suppl. Br. at 13. On the other hand, the State also argues that H.O. actually *received* attachment services through Eastep's

therapeutic visitation. Neither argument is supported by the record. If Eastep provided attachment services, then H.O. certainly had the emotional skills necessary to benefit from them: H.O. handled visitation so well that Eastep reduced her supervision by half. But Eastep did not provide attachment services. Eastep testified that she is not an attachment expert, and Clemons testified that she could be doing attachment work with H.O. and B.P., but had not received a referral to do such work. The record contains no testimony whatsoever indicating that H.O. received attachment services, although it does contain evidence that she requested them.

By ignoring this request and denying H.O. any opportunity to demonstrate her capacities for real attachment work, the State violated its statutory and constitutional obligation to offer or provide "all necessary services, reasonably available, capable of correcting parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d); see C.S., 168 Wn.2d at 55-56. It encouraged H.O. to participate in months of services that were not designed to address attachment issues, then cited her alleged *possible* incapacity for attachment work as grounds for termination. This falls short of the duty to offer or provide services.[8]

---

[8] The dissent's contrary conclusion depends on speculation, unsupported by the record, that the "therapeutic visit[s]" Eastep facilitated were the best attachment therapy H.O. could hope for, given the nature of her relationship with B.P. Dissent at 7 (acknowledging that Eastep is not an attachment expert and that Clemons could have provided actual attachment therapy to H.O. and B.P.; nevertheless concluding that "the services provided . . . by Ms. Eastep were similar to those provided [to B.P.'s foster parents]

32

Finally, there is insufficient evidence in the record to sustain the conclusion that attachment services would be futile at this point. The dissent credits the State's argument on appeal that attachment services could not succeed in the "foreseeable future," RCW 13.34.180(1)(d), because (1) H.O. had not progressed enough in her individual therapy or addiction recovery to help B.P. grieve the loss of her foster family, dissent at 9-11, and (2) "[i]t would take 'hundreds [or] . . . thousands of contacts'" to create a secure attachment between H.O. and B.P., and that would take too long. Dissent at 12 (quoting 1 RP at 77 (Feb. 10, 2014)). But both of those theories conflict with the State's actions in the six months preceding trial.

During these months, the State encouraged H.O. to participate in the services it did provide, leading her to believe that these services were an avenue to H.O.'s return. Then it pursued termination on the theory that B.P.'s attachment needs were so severe that H.O. could not possibly meet them in the foreseeable future, given her location on the path to full recovery from substance abuse and childhood trauma. If there were evidence that H.O. had not progressed in treatment as expected during

---

by [the attachment expert] Ms. Clemons"), 8 (concluding, without citation to the record, that "it would be unreasonable to expect the services provided to H.O. to be identical to those provided to the foster parents"). This speculation amounts to fact-finding that "exceeds this court's proper role on review." *Id.* at 2. And it is only by engaging in such fact-finding—by concluding that H.O. in fact received attachment services from Eastep but that these services "resulted in limited success," *id.* at 6-7—that the dissent is able to conclude that further attachment therapy would have been futile.

the six months preceding trial, then the State's actions might be reasonable. But H.O.'s only slipups were two technical violations: accepting a ride from B.P.'s foster father while still living at Isabella House (a violation she self-reported to her counselors) and failing to verify participation in two outside support meetings in the first month of transitional housing treatment (something she attributed to her confusion over the program's definition of an eligible meeting). H.O. never failed a UA during treatment, and no treating professional testified that they had current concerns about her sobriety. H.O. was successfully participating in all of the mental health services the State provided. On this record, the State's sudden about-face in January 2014 is fundamentally unfair.

Simply put, the record contains no explanation for the State's decision to assign H.O. a regimen of individual and family therapy, watch as she progressed in this therapy just as her treating professionals expected, and then argue that no amount of therapy could prepare her for the demands of real attachment work in the foreseeable future. Absent that explanation, the record does not contain clear, cogent, and convincing evidence that attachment services would be futile.[9]

---

[9] Nor does this case does involve overwhelming, undisputed testimony that B.P. will suffer an irreparable attachment disorder if forced to separate from her foster parents. And while the Department presented evidence that attachments normally form around age one, it did not present evidence that attachment services would have been futile for this reason—indeed, the Department provided those services for B.P.'s foster parents well after B.P.'s first birthday. Thus, amici are correct that the record does not support the conclusion that

To be sure, this case *does* involve testimony that removing B.P. from her foster home and placing her in H.O.'s care poses risks to B.P.'s emotional well-being. But where parental rights are at stake, such risks do not constitute parental unfitness if they might be mitigated through services. *See A.B.* II, 181 Wn. App. at 64 (substantial evidence supported finding that mother's cognitive impairments "resulted in a lack of understanding of child development stages and difficulty identifying certain subtle dangers," but these parental deficiencies did not amount to clear, cogent, and convincing evidence of unfitness; instead, they created a risk of harm warranting participating in services). In this case, numerous expert witnesses testified that they were available to provide services designed to help H.O. address B.P.'s special attachment needs. No witness testified that H.O. was incapable of benefiting from these services or that the services would be futile for some other reason. Thus, the State did not fulfill its obligation to provide "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future," RCW 13.34.180(1)(d), and the termination order must be reversed.[10]

---

if a child is not attached to his or her parent by age one, there are no services that can rectify that problem.

[10] Because we reverse on this basis, we do not address H.O.'s arguments regarding parental unfitness.

CONCLUSION

The trial court's findings of fact in a termination proceeding will not be disturbed so long as they are supported by substantial evidence in the record. *Hall*, 99 Wn.2d at 849. However, because the State must prove its case in a termination proceeding by clear, cogent, and convincing evidence, that evidence must be "more substantial than in the ordinary civil case in which proof need only be by a preponderance." *Id.* While the State need not provide corrective services to a parent if those services would be futile, services are not futile just because they are not guaranteed to succeed. *See C.S.*, 168 Wn.2d at 56 & n.2.

Consistent with the holdings in *C.S.*, and *S.J.*, testimony that a parent might not have the emotional skills or other personality traits necessary to benefit from services does not amount to clear, cogent, and convincing evidence that the services would be futile or that the parent's deficiencies are unlikely to be remedied in the near future. Where there is any reasonable possibility of success, the services must be provided.

The termination order in this case violated these protections. We therefore reverse that order.

WE CONCUR:

No. 91925-9

YU. J. (dissenting)—By the time of the termination trial, two-and-a-half-year-old B.P. had already spent most of her young life in dependency, waiting for her mother H.O. to become a stable parent. During this time, B.P. went through four placements and, due to H.O.'s failure to maintain a consistent relationship with her, B.P. no longer has an attachment to her mother. The instability of B.P.'s first few years have already taken a serious toll on her. Experts testified at trial that B.P. was in danger of developing an attachment disorder that could delay her social and emotional development. She could not risk yet another placement disruption.

B.P. is now five years old. She is still in dependency but has formed a complete and secure attachment to her foster parents. The effect of the majority's opinion is to stop the clock yet again on B.P.'s permanent placement. "To postpone [the child's] access to stability in the hope that the mother will be able to correct deep-seated emotional problems and assume the obligations of parenthood,

1

when all the evidence shows that she lacks the capacity to do so, is to ignore the desperate needs of the [child]." *In re Welfare of Aschauer*, 93 Wn.2d 689, 694-95, 611 P.2d 1245 (1980). Rather than have the stability and permanence she so desperately needs to ensure her healthy development, the majority holds that B.P. must continue to wait.

Weighing all of the evidence before it, the trial court made the difficult but tenable decision to terminate H.O.'s parental rights. There is substantial evidence in the record to support the trial court's findings of fact, yet the majority now reweighs the evidence itself and determines otherwise. Because the record supports the trial court's decision to terminate H.O.'s parental rights and the majority exceeds this court's proper role on review, reaching a result that will likely be detrimental to B.P., I must respectfully dissent.

ANALYSIS

"We are firmly committed to the rule that a trial court's findings of fact will not be disturbed on appeal if they are supported by 'substantial evidence'." *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973). Our role on appeal is to determine whether there are sufficient facts to support the trial court's findings of fact. *Id.* at 740. It is not our role to assess the credibility of the witnesses or determine how much weight to give the evidence presented. Yet this is precisely what the majority does.

2

Contrary to the majority's assertions, there is substantial evidence in the record to sustain the trial court's findings of fact. The testimony presented at trial shows that all necessary services were provided to H.O., but she remained unfit to parent B.P. at the time of trial.

A.   NECESSARY SERVICES

RCW 13.34.180(1)(d) requires the Department of Social and Health Services (Department) to offer or provide "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." The Department identified H.O.'s parental deficiencies as "substance abuse, mental health issues, criminal history and an inability to meet the physical and emotional needs of the child." Clerk's Papers (CP) at 2. It is undisputed that H.O. was offered or provided with the following services: "chemical dependency inpatient treatment, outpatient treatment, [urinanalysis/blood alcohol] monitoring, individual counseling, parenting assessment, parenting services including family preservation services and therapeutic visits with [Lori] Eastep in part to address the mother child relationship." *Id.* at 181.

H.O. asserts that the Department failed to provide her with all necessary services because she never received attachment therapy. However, the evidence substantially shows that (1) H.O. was provided with services tailored to address her identified parental deficiencies and (2) any additional services would not remedy

3

H.O.'s parental deficiencies within the foreseeable future. Consequently, there is sufficient evidence in the record to support the trial court's finding that the Department fulfilled its obligation to provide all necessary services under RCW 13.34.180(1)(d).

1. *H.O. was provided with services tailored to address her identified parental deficiencies*

Although concerned that "attachment services in the classical and clinical sense were not articulated to have been provided to [H.O.]," 3 Verbatim Report of Proceedings (VRP) at 442, the court ultimately determined that "[t]he services offered were those needed to remedy [H.O.]'s parental deficiencies," CP at 181. This determination is supported by the evidence in the record, and the majority overlooks the fact that H.O. *did* receive services specifically tailored to address her parental deficiencies.

H.O.'s persisting parental deficiencies were her "mental health and how it impacted her ability to parent [B.P.]" and "issues with her parental relationship with [B.P.]." *Id.* at 182, 184. Among the services provided to H.O. were "parenting services including family preservation services and therapeutic visits with Ms. Eastep in part to address the mother child relationship." *Id.* at 181. These services were clearly intended to address the parental deficiencies identified by the Department.

When visitation resumed after H.O.'s relapse, H.O. had not had any contact with her daughter for 11 months. 1 VRP at 62. The Department made a referral to Ms. Eastep, a licensed independent clinical social worker, to assess parent-child interactions. *Id.* at 61. The majority mischaracterizes Ms. Eastep as being "confused" about the Department's goals regarding visitation. Majority at 30-31. The evidence in the record, however, shows that Ms. Eastep was actually accounting for existing and potential circumstances as they were presented to her at the time.

Following her initial therapeutic visit, Ms. Eastep advised that "[i]t seems contraindicated to begin visitation if the Department is moving toward termination and [H.O.] has not made sufficient progress in a timely manner to extend or postpone the trial." 1 VRP at 64. Bear in mind that at the time of Ms. Eastep's evaluation, the original date of the termination hearing was imminent and H.O. had only then filed a motion requesting visitation after an extended absence. Ms. Eastep explained:

> Because we were looking at a very short timeframe and for a child of [B.P.]'s age, being brought to a visitation place, being exposed to people that she's very unfamiliar with can create a lot of internalized stress. It can create unnecessary upset. If the termination trial was going to still move forward, it did not seem to make sense to me at that time.

*Id.* at 65. Therefore, she stated that "[i]f visitation is only to satisfy a service requirement, it would be detrimental to [B.P.]'s emotional stability and create placement instability and possible upset and would not be in the best interest of [B.P.]." *Id.* In the alternative, however, Ms. Eastep recommended that "if [H.O.] has demonstrated the necessary progress and is given an opportunity to demonstrate this further, [she] would support reinstatement of visitation with [B.P.]." *Id.* Thus, it is apparent that Ms. Eastep's recommendations were dependent on H.O.'s ability to remedy her parental deficiencies in the context of the upcoming termination trial.

Consistent with Ms. Eastep's recommendation, the dependency court ultimately decided to continue the termination hearing based on the fact that "the parties agree that the mother needs to have some visitation in order to determine if the parent child relationship can be repaired." CP at 66. The majority correctly observes that the order for continuance was contrary to a prior order that denied visitation. Majority at 7; *see* CP at 66. It is unclear from the record why the dependency court changed its mind. However, what *is* clear is that H.O. was granted additional time and services—weekly therapeutic contact and a parenting assessment—specifically to address her relationship with B.P. CP at 66.

Ms. Eastep continued working with B.P. and H.O., ultimately conducting a total of 22 sessions. 1 VRP at 82. Ms. Eastep's work with B.P. and H.O. resulted

6

in limited success. She observed that mother and child had developed a social relationship and there was an emerging emotional connection but no evidence of an attachment. *Id.* at 67-68, 75.

The majority unfairly rebukes the Department for providing only therapeutic visitation with Ms. Eastep that "predictably" resulted in a social relationship between H.O. and B.P. Majority at 30. However, this assessment overlooks the fact that when visitation resumed after an extended period of no contact, H.O. and B.P. had no relationship at all. 1 VRP at 63. The development of an emotional relationship that would allow for a secure attachment requires emotional stability, which H.O. has yet to achieve, and significant time, which B.P. does not have.

The majority also disregards the services provided by Ms. Eastep because "Eastep testified that she is not an attachment expert, and [Amanda] Clemons testified that she could be doing attachment work with H.O. and B.P." Majority at 31. However, there was no testimony that the services Ms. Eastep provided were inappropriate, inadequate, or different from what other service providers would have provided. In fact, the evidence suggests that the services provided to H.O. by Ms. Eastep were similar to those provided by Ms. Clemons to B.P.'s foster parents—Ms. Eastep testified that her treatment goals with H.O. included "to assist [H.O.] in identifying cues and boundaries that [B.P.] has related to their physical and emotional contact," 1 VRP at 67, while Ms. Clemons testified that her work

7

with the foster parents included helping them understand what B.P.'s underlying needs were when she "miscue[s]", 2 VRP at 166. H.O. has a completely different relationship with B.P. than her foster parents, who are her primary caregivers and primary attachments. It appears that both H.O. and the foster parents were provided with training on how to interact with B.P. given the particular nature of their relationships, and under the circumstances presented, it would be unreasonable to expect the services provided to H.O. to be identical to those provided to the foster parents.

Consequently, reliance on *In re Welfare of S.J.*, 162 Wn. App. 873, 256 P.3d 470 (2011), and *In re Welfare of C.S.*, 168 Wn.2d 51, 225 P.3d 953 (2010), is misplaced. In *S.J.*, the Court of Appeals concluded that the Department had failed to tailor services to the mother's needs. 162 Wn. App. at 882. Similarly, in *C.S.*, the Department failed to provide services to the mother that had been provided to the foster parents and would have helped the mother manage the child's behavioral problems. 168 Wn.2d at 55-56. Neither of these factual scenarios is present here. In this case, H.O. *was* provided with services that were tailored to her specific parental deficiencies—treatment for her substance abuse, individual therapy to address her mental health issues that were affecting her ability to parent B.P., and also therapeutic visitation aimed at building a relationship with B.P.

>   2.    *Additional services would not correct parental deficiencies within the foreseeable future*

RCW 13.34.180(1)(d) does not require the provision of *all* services capable of correcting parental deficiencies, only those capable of doing so *within the foreseeable future*. The majority gives short shrift to this statutory requirement and fails to consider that the foreseeable future is determined from the point of view of the child. *See In re Welfare of Hall*, 99 Wn.2d 842, 851, 664 P.2d 1245 (1983). The trial court concluded that "[B.P.]'s foreseeable future is now," CP at 187, and additional services would not have been capable of remedying H.O.'s parental deficiencies within the foreseeable future because "the services necessary to build the type of relationship necessary to meet [B.P.]'s needs would take one year or more and that is too long," *id.* at 186; *see also* 3 VRP at 443 ("necessary services were certainly given and they were quality services, but they simply were not able to overcome the fact that the foreseeable future cannot be yet another year"). The record amply supports this finding; indeed, the record suggests that the one-year time frame is conservative at best.

In order for H.O. to be a stable parent to B.P., she would need to first address her significant mental health issues. Ms. Eastep testified that B.P. would not form an attachment with H.O. unless B.P. was removed from her current foster placement and returned to H.O.'s custody. *See* 1 VRP at 77-79. In the event of

9

such removal, B.P. would need substantial emotional support to grieve the loss of her attachment to her foster parents. CP at 92. However, testimony indicated H.O. would not be able to provide such support in the near future. Although H.O. had made strides in individual therapy, her therapist Sandra Gorman-Brown was unsure if H.O. had "made enough progress therapeutically to be able to be emotionally available to [B.P.]" to allow for reunification. 1 VRP at 147-48. According to Ms. Gorman-Brown, it would take "at least another six months in individual therapy" to resolve H.O.'s trauma history. *Id.* at 149-50. Six months may not seem like a significant amount of time, but it might as well be an eternity for B.P. *See Hall*, 99 Wn.2d at 851 ("'Three months may not be a long time for an adult decisionmaker. For a young child it may be forever.'" (quoting JOSEPH GOLDSTEIN, ANNA FREUD & ALBERT J. SOLNIT, BEYOND THE BEST INTERESTS OF THE CHILD 43 (1973))).

There was also consistent testimony about B.P.'s pressing need for stability and permanence. By the time of trial, B.P. had already been through four placements. CP at 90. Carol Thomas, a licensed mental health therapist who conducted a parent-child assessment of H.O. and B.P., testified that continued disruptions in B.P.'s ability to form attachments would turn into an attachment disorder. 2 VRP at 163. Ms. Thomas explained that an attachment disorder "impacts pretty much every arena of [a person's] life: [l]ow self-esteem, can create

depression, anxiety issues, other mental health concerns, emotional disregulation in children, behavioral issues as a result." *Id.* Thus, the absence of permanent placement in the immediate future would likely have "significant ramifications" for B.P.'s emotional development and mental well-being. *Id.*

Furthermore, six months was *not* the amount of time it would take to make H.O. fit to parent B.P.—six months was only the *minimum* amount of time H.O. would need in individual therapy to work through her own trauma. In addition to this work in individual therapy, H.O. would need to maintain her sobriety for an extended period of time. Marcey Monohan, the social worker assigned to B.P.'s case, testified that given the length of H.O.'s drug addiction, she would want to see H.O. maintain sobriety for *18 months to 2 years* before she would feel comfortable that H.O. was solidly in recovery this time. *Id.* at 283. This time period was echoed by Carla Paullin, who provided H.O. with chemical dependency therapy. Ms. Paullin testified that for someone with H.O.'s extensive history of intravenous drug use, she would want to see two years of structured treatment therapy before she would consider the addiction to be in remission.[1] *Id.* at 198.

On top of the work needed to resolve her parental deficiencies, developing a relationship that would allow B.P. to securely attach to H.O. would likely take

---

[1] Ms. Paullin also pointed out that the type of therapy that H.O. would need to achieve remission is not even offered in her service area. 2 VRP at 198.

11

much longer. By the time of trial, Ms. Eastep testified that B.P. and H.O. had developed only a social relationship, akin to a child's relationship with a babysitter, and an emotional connection was just emerging. 1 VRP at 75, 77-78. It would take "hundreds and sometimes thousands of contacts" to transition from an emerging emotional relationship to a secure attachment that would allow for reunification. *Id.* at 77. There simply is no way of telling how long it would take for this to occur—or if it would occur at all. *See id.* at 71.

While it is possible that H.O. will be able to maintain her sobriety and continue to successfully work on her mental health issues, there was no evidence provided that she would reach a point of stability within a time period that would be conducive to B.P.'s emotional well-being. I am sympathetic to H.O.'s concerted effort to become a stable parent and recognize that past behavior is not necessarily a measure of future success. However, it is undeniable that the threat of relapse is real and the potential harm to B.P. would be significant.

Ms. Eastep testified that the Department would be taking a "calculated risk" by returning B.P. to her mother's custody. *Id.* at 84. H.O. has not been able to maintain her sobriety outside of a structured living environment, and, just prior to the termination trial, H.O. was already exhibiting worrisome behaviors. Karen Schweigert, the guardian ad litem, expressed concern that H.O. lied to a counselor about returning her phone calls. 2 VRP at 237-38. Even more troubling was

Ms. Monohan's testimony about H.O.'s failure to attend support groups, a behavior that had preceded H.O.'s prior relapse. *Id.* at 281-82. This contravened her counselor's explicit recommendations. 1 VRP at 38. Paige Beerbohm, H.O.'s counselor at Isabella House, testified that it was concerning that H.O. was struggling to attend self-help groups so early in her recovery. *Id.* Failure to attend self-help meetings can increase the risk of relapse. *Id.* at 37. H.O.'s therapist emphasized the importance of building a strong support system to help maintain her sobriety. 2 VRP at 198.

Whether a parent is capable of correcting parental deficiencies is not the only question that we must ask here. RCW 13.34.180(1)(d) requires us to inquire into the probable length of time that it will take for parental deficiencies to be remedied by specifying that the services to be offered or provided are limited to those services "capable of correcting the parental deficiencies *within the foreseeable future.*" (Emphasis added.) Whether the length of time it will take to correct parental deficiencies warrants delaying termination so the parent may receive additional services depends on the child's developmental needs as determined by the context of the child's placement and age. *See In re Dependency of T.R.*, 108 Wn. App. 149, 164-65, 29 P.3d 1275 (2001) ("T.R. was six years old at the time of trial and had been in foster care all her life. To wait another year, or longer, is to wait well beyond T.R.'s foreseeable future."); *In re Dependency of*

13

*P.D.*, 58 Wn. App. 18, 27, 792 P.2d 159 (1990) (6 months was not within the "near future" of a 15 month old).

In this case, there was evidence of B.P.'s urgent—if not immediate—need for permanence in order to allow for her healthy emotional development. The testimony was consistent on the fact that H.O. was not stable at the time of trial and that it would take a considerable amount of time *beyond* the time that B.P. had already spent in dependency before H.O. *might* be stable enough to provide for B.P.'s emotional needs. These facts substantially support the trial court's finding that H.O.'s parental deficiencies cannot be remedied within the foreseeable future.[2]

B.    CURRENT PARENTAL UNFITNESS

The majority declines to address the issue of current parental unfitness, but the record substantially supports the trial court's finding that H.O. was unfit to parent B.P at the time of the termination trial. The focus at a termination trial is current parental unfitness. *In re Welfare of H.S.*, 94 Wn. App. 511, 523, 973 P.2d 474 (1999) (citing *In re Dependency of K.R.*, 128 Wn.2d 129, 142, 904 P.2d 1132

---

[2] The majority misinterprets this assertion as an application of the futility doctrine. Majority at 32-33. We should not conflate the question of whether providing a service would be futile with whether the service could remedy a parental deficiency within the foreseeable future, as required by RCW 13.34.180(1)(d). The issue here is not whether it would be futile to provide H.O. with additional services. Rather, the issue is whether there is substantial support in the record for the trial court's finding that any additional services would not remedy H.O.'s parental deficiencies within the foreseeable future, as determined from B.P.'s point of view in accordance with our case law. *See Hall*, 99 Wn.2d at 851. I conclude that the evidence presented at trial does support such a conclusion and the majority's reweighing of the evidence is troubling.

14

(1995)). Because every parent-child relationship is different, parental unfitness is determined on a case-by-case basis. *See In re Welfare of A.B.*, 168 Wn.2d 908, 921, 232 P.3d 1104 (2010). However, in the broadest sense, a parent must be able to fulfill his or her duty to provide a child with "basic nurture." RCW 13.34.020. There was substantial evidence showing that H.O. was unable to provide for B.P.'s emotional needs, which is a component of basic nurture. This is sufficient to support the trial court's finding of current parental unfitness.

The tragic story that the record tells about H.O. is of a deeply troubled person who is unable to put the needs of B.P. above her own. *See* 2 VRP at 213. B.P. was born addicted to methamphetamine, a drug that H.O. first used at the age of 13 and continued to use through all of her pregnancies, including her pregnancy with H.O.'s younger sibling, A. B.P. was immediately removed from H.O.'s custody at birth and spent the first two months of her life in dependency. She was eventually returned to H.O.'s custody for 10 months, only to be removed again when H.O. relapsed. B.P. has been in dependency ever since.

H.O. has been a sporadic presence in B.P.'s life. After missing 10 scheduled visits with B.P., the dependency court decided to suspend H.O.'s visitation at the end of October 2012. *Id.* at 261. The court ordered that visitation would not resume unless H.O. brought a motion to reinstate visitation. CP at 89. H.O. did not file her motion to reinstate visits until almost nine months later, in July 2013—

15

which was more than six months after the Department filed its petition to terminate

parental rights. During this time, B.P. had no contact with her mother. When

visitation resumed in August 2013, B.P. no longer recognized H.O. as her

mother—in fact, B.P. no longer recognized H.O. at all.

Now, after an extensive absence from B.P.'s life, H.O. wants to be a parent

to her daughter. Yet the consistent testimony at trial was that H.O. has not

remedied her parental deficiencies. Her recent sobriety is relatively short

compared to her decades-long struggle with substance abuse; she has yet to

establish that her recovery is stable. H.O. has no track record of maintaining her

sobriety outside of a structured living environment. There was testimony that the

longest she had been able to maintain sobriety was five years. 1 VRP at 34-35.

H.O. has never successfully parented a child for an extended period of time, nor

has she ever parented without assistance or supervision. *See* 2 VRP at 235. H.O.

cannot remain in structured living indefinitely. Furthermore, H.O. was beginning

to exhibit the same behavior that led up to her prior relapse.

Not one of the service providers assigned to this case testified that B.P.

should be returned to H.O.'s custody. The trial court stated:

> The mother is currently unfit to parent [B.P.]. This element requires
> the court to determine if [H.O.] is able to meet [B.P.]'s needs. The
> evidence clearly indicates that she cannot. [H.O.] relapsed causing a
> disruption in her relationship with [B.P.]. She failed to consistently
> visit [B.P.] and did not maintain a relationship with her. [H.O.] is

16

responsible for the stops and starts in her parenting. She does not understand [B.P.]'s needs for permanency or the risk she faces if she develops an attachment disorder. [H.O.] cannot claim that because [A.] is in her care, that she must be fit to parent. [B.P.]'s needs are different and her attachment issues are the result of her mother's actions. [H.O.] has not demonstrated an ability to understand her own feelings, or those of [B.P.]. Thus, the Department has established that [H.O.] is currently unfit to parent.

CP at 187-88. The trial court's findings regarding H.O.'s inability to provide for B.P.'s emotional needs are supported by testimony presented at trial. *See, e.g.*, 2 VRP at 275 (Ms. Monohan testified that H.O.'s mental health remains a concern "in regards to her ability to be emotionally available for a child like [B.P.]").

The evidence presented at trial shows that H.O. was currently unable to provide for B.P.'s emotional needs. Consequently, there is substantial evidence in the record to support the trial court's finding that H.O. is unfit to parent B.P.

CONCLUSION

Under our laws, B.P. has a right to "basic nurture," which includes "the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter." RCW 13.34.020. Furthermore, our legislature has explicitly declared that "[w]hen the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail." *Id.* The majority ignores this mandate and fails to properly consider B.P.'s rights.

17

I agree with the trial court's assessment that "[H.O.] clearly loves [B.P.] and wants to parent her. However, [B.P.] can no longer wait for [H.O.] to remedy her parental deficiencies." CP at 187. There is no question that H.O. was "dealt a difficult set of cards." 3 VRP at 438. The progress that she has achieved thus far is commendable. However, although H.O. has started down the road to recovery, progress is rarely ever a straight path, and there is no question that H.O. has a difficult and long journey ahead of her. The sad reality is that H.O.'s progress comes too little, too late for B.P.

The facts show that H.O. was provided with all necessary services to remedy her parental deficiencies as required by RCW 13.34.180(1)(d), yet she still remains unfit to parent B.P. What she asks for now is more time to remedy her parental deficiencies despite a demonstrated inability to do so. As the trial court observed, "Without termination, the child remains in the limbo of foster care indefinitely." CP at 187. How much longer must B.P. remain there?

I would affirm the Court of Appeals and must respectfully dissent.

Yu, J.

González, J.

Owens, J.

Madsen, C.J.

19