# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Dependency of:

L.A.N. (DOB: 08/10/2005),

Minor child.

CHERYL NEWELL,

Appellant,

v.

STATE OF WASHINGTON,
DEPARTMENT OF CHILDREN,
YOUTH AND FAMILIES,

Respondent.

No. 78435-8-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: June 10, 2019

DWYER, J. — Cheryl Newell appeals the trial court's order terminating her parental rights to her son, L.A.N. Newell argues that the Department of Children, Youth and Families failed to prove by clear, cogent, and convincing evidence that all necessary and reasonably available services were offered or provided to her. She also challenges the trial court's finding that she was unfit to parent.[1] We affirm.

I

L.A.N. was born in 2005, the third of Newell's five children. Newell had a lengthy history of substance abuse dating back to at least 1998. In 2008, when

---

[1] We grant Newell's motion to file two supplemental assignments of error.

L.A.N. was two and a half years old, Newell's fourth child was born drug-affected. The Department filed a dependency petition and offered substance abuse treatment services to Newell. When Newell did not follow through, both L.A.N. and his younger sibling were removed from her care. Newell has not seen L.A.N. since that time.

L.A.N. lived with foster parents, Tonya and Curtis Kidder, for approximately nine months. The juvenile court then placed L.A.N. with his father. The dependency proceedings were dismissed after a parenting plan was entered that provided L.A.N. was to reside "at all times" with his father. The parenting plan restricted Newell's contact with L.A.N. based on "long-term impairment resulting from drug, alcohol or other substance abuse that interferes with the performance of parenting functions." Newell was allowed one hour of supervised visitation per week. According to Newell, L.A.N.'s father never permitted her to visit L.A.N.

While living with his father, L.A.N. remained in frequent contact with the Kidders. He spent every weekend and most holidays and school vacations at their home. The Kidders treated L.A.N. as part of their family.

In May 2015, when L.A.N. was nine years old, he disclosed that he was being physically abused by his father.[2] The Department again filed a dependency petition. L.A.N. expressed "a lot of anxiety around the thought of

_____

[2] L.A.N.'s father was ultimately convicted of fourth degree assault and a no-contact order was entered. He later relinquished his parental rights and is not a party to this appeal.

returning home to his father or being placed with this mother." L.A.N. was placed back with the Kidders.

Newell agreed to the establishment of dependency. The order noted that Newell was "willing to allow [L.A.N.] to reside in current placement until they develop a relationship." The dependency order required Newell to participate in individual mental health counseling and random urinalysis testing. The order also provided that visitation between L.A.N. and Newell would be "per discretion of child and therapists, supervised." Newell was required to undergo a parenting assessment "after visitation is established and at least 4 visits have occurred."

At the hearing on the dependency petition, Tonya Kidder gave Newell a photograph of L.A.N. and her Facebook Messenger address so that Newell could stay in contact with her. Newell sent Kidder one message later that month involving L.A.N.'s father. She never contacted Kidder again.

The Department social worker, Robert Credle, suggested that Newell write letters to L.A.N. to begin the process of becoming reacquainted. Credle told Newell to send the letters to him, and he would review them and provide them to L.A.N. Credle explained that if L.A.N. responded well to the letters, contact would progress to telephone calls and then in-person visitation.

However, in approximately November or December 2015, Newell told Credle that she was going to Mexico "for a month or two" to take care of "legal matters." Newell claimed she was in Mexico for only three weeks. But Credle testified that he tried to contact Newell approximately 10 or 15 times over the next several months, and was unable to reach her by phone, text message or at

3

her physical address. The record shows that Newell did not return to the United States or have any communication with the Department until sometime after a review hearing held in June 2016.

Newell did not write any letters to L.A.N. until December 2016, nearly a year and a half after the establishment of dependency. She wrote again in March 2017. Several months passed with no correspondence. Newell then wrote a letter in October 2017 apologizing for not having written and promising L.A.N. "I am going to be sending you a letter every week." Newell wrote weekly letters for approximately three weeks and then stopped. She admitted she never wrote L.A.N. again. Newell "blamed her . . . lack of letter writing on multiple factors including: no car, no computer, her work schedule, and the social worker being rude to her." The trial court explicitly found Newell's explanations not credible.

The Department filed a termination petition. Trial on the petition occurred over a period of six days in March 2018. At the time of the termination trial, Newell had completed the urinalysis testing requirement and had been successfully discharged from her mental health treatment program. She testified that she had been clean and sober for approximately two years.

Tonya Kidder described L.A.N. as "a great kid" who "needs a lot of help." L.A.N. was diagnosed with posttraumatic stress disorder (PTSD). Kidder explained that L.A.N. would frequently "throw fits for three days straight" in which he did not sleep and broke everything in his room. Kidder stated that L.A.N.'s

behavior had improved slightly in recent months, and she attributed this to "[n]obody ever giving up."

Credle described that, on the few occasions that L.A.N. received letters from Newell, he would "get angry" and his behavior would "spike up." He testified that receiving letters on such an inconsistent schedule was damaging to L.A.N. When L.A.N.'s therapist tried to talk about his mother with him, L.A.N. refused.

Devin Howell, L.A.N.'s education advocate, testified that L.A.N. had "issues with trusting people, particularly adults." Howell testified that adults were able to overcome L.A.N.'s trust issues with "open communication, consistent communication." Howell testified that it was "critical in [L.A.N.'s] life to have people that he can count on and – and go to on a – on a nightly basis."

L.A.N., who was 12 years old at the time of the termination trial, testified that he did not have, nor did he want, any type of relationship with Newell.

> [L.A.N.'s attorney:] Okay. All right. Okay. So, [L.A.N.], I'm going to start asking – we've gone through some of these questions. Have you ever had any contact, that you can remember, with your mother?
>
> [L.A.N.:] No.
>
> [L.A.N.'s attorney:] Do you ever remember talking to your mother?
>
> [L.A.N.:] No.
>
> [L.A.N.'s attorney:] Okay. Do you have any sort of relationship with your mother?
>
> [L.A.N.:] No.
>
> [L.A.N.'s attorney:] Okay. Do you want to be reunited, or returned, or live with your natural, biological mother?
>
> [L.A.N.:] No.

[L.A.N.'s attorney:] Okay. Where do you want to stay?

[L.A.N.:] With Tonya.

[L.A.N.'s attorney:] Okay. Why do you want to stay with Tonya?

[L.A.N.:] Because she supports me and has – always has my back.

[L.A.N.'s attorney:] Why don't you want to return to your natural, biological mother?

[L.A.N.:] Because I don't even know her.

[L.A.N.'s attorney:] Do you want to have a relationship or talk to your mother at all?

[L.A.N.:] No.

[L.A.N.'s attorney:] Okay. Are you willing to go to counseling to try to establish, to create, or to have a relationship with your mother?

[L.A.N.:] No.

. . .

[L.A.N.'s attorney:] [W]hen you think who my family is, who do you think of?

[L.A.N.:] Tonya and Curtis.

[L.A.N.'s attorney:] Okay. Okay. And do you want to change where you're living?

[L.A.N.:] No.

[L.A.N.'s attorney:] Okay. And does it help you to do well in school, and to do well at home, to be in where you're at now, with Tonya and Curtis?

[L.A.N.:] Yes.

[L.A.N.'s attorney:] Okay. And I'm – this is a tough question, so if you want me to ask it again, why don't you want to be with your mother, your natural, biological mother?

[L.A.N.:] Because I don't know her.

[L.A.N.'s attorney:] Okay. And do you want to have any form of communication such as letters or Skype or anything like that with your natural mother?

[L.A.N.:] No.

Newell called Dr. Daniel Rybicki, a clinical and forensic psychologist, to testify about various types of family estrangement, including "parental alienation syndrome" and "visitation resistance." Dr. Rybicki explained that reunification therapy can help to address these issues, and that such therapy was offered in the Seattle area. But Dr. Rybicki admitted that he had never met Newell or L.A.N., and was unable to make any diagnoses or recommendations specific to their case.

In rebuttal, L.A.N. offered the testimony of psychologist Dr. Steve Tutty, who testified that reunification therapy "is quite difficult and the outcomes are not always positive." Dr. Tutty explained that reunification therapy was not generally accepted in the professional community, and that "it's difficult to create any kind of therapeutic change" if "one party . . . feels forced into it."

After reviewing 64 exhibits and hearing the testimony of eight witnesses, the trial court entered findings of fact, conclusions of law and an order terminating Newell's parental rights. Newell appeals.

II

Parents enjoy fundamental liberty interests in the continued care, custody, and companionship of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L.Ed. 2d 599 (1982). Termination of the parent-child relationship involves a two-step process. In re Welfare of A.B., 168 Wn.2d 908,

911, 232 P.3d 1104 (2010). First, the Department must prove the six termination factors set forth in RCW 13.34.180(1) by clear, cogent, and convincing evidence. A.B., 168 Wn.2d at 911. If this burden is satisfied, the court must also find by a preponderance of the evidence that termination is in the best interests of the child. RCW 13.34.190; In re Dependency of K.N.J., 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011).

Where, as here, the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the court's findings of fact and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). Unchallenged findings of fact are verities on appeal. In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015). Challenged findings will be upheld "[i]f there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown to be "'highly probable.'" In re Dependency of T.L.G., 126 Wn. App. 181, 197, 108 P.3d 156 (2005) (quoting In re Dependency of H.W., 92 Wn. App. 420, 425, 961 P.2d 963, 969 P.2d 1082 (1998)). We defer to the trier of fact on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence. In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011).

III

Newell contends that the trial court erred in terminating her parental rights because the Department failed to refer her for the court-ordered parenting evaluation or provide her and L.A.N. with reunification therapy.

The Department has a statutory obligation to provide all the services ordered by the permanency plan, as well as "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d); In re Parental Rights to K.M.M., 186 Wn.2d 466, 479, 379 P.3d 75 (2016). Necessary services are those services "'needed to address a condition that precludes reunification of the parent and child.'" K.M.M., 186 Wn.2d at 480 (quoting In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014)).

Regarding the parenting evaluation, Newell agreed in the dependency order that the Department would refer her only "after visitation is established and at least 4 visits have occurred." Newell was aware that she would not have any in-person visits with L.A.N. until she had re-established a relationship with him. Yet Newell did not make any attempts to contact L.A.N. for the first 18 months of the dependency proceedings. And her efforts after that were sporadic and full of broken promises. Because Newell did not meet the prerequisite for this service, the Department was not obligated to offer it.

Moreover, in the absence of any relationship with L.A.N., a parenting evaluation was not a service that was "reasonably available" to Newell. Dr. Tutty explained that the purpose of a parenting evaluation is to observe the parent and

child together "across different dimensions to determine quality of bond and consistency of bond."[3] Newell and L.A.N. had no bond to observe because Newell did not follow the recommendations to establish one.

Newell's claim that the Department failed to provide her with reunification therapy similarly fails. None of the professionals in the case recommended reunification therapy as a service. Only Dr. Rybicki testified as to its utility in the case of parental alienation syndrome or visitation resistance. But Dr. Rybicki did not assess whether such a service was appropriate for L.A.N. The trial court found that "Dr. Rybicki's ultimate opinions about possible interventions, services, or likely outcomes in cases of an alienated or estranged child are speculative, lack probative value, and are not given weight." Newell does not challenge this finding and it is a verity on appeal.

Moreover, Dr. Tutty testified that reunification therapy could actually be harmful to L.A.N. He explained that "if the parent is inconsistent for whatever reason, then from the child's perspective it may trigger, you know, a perception of distrust and perhaps abandonment." According to Dr. Tutty, children with PTSD are particularly vulnerable to reunification therapy and should not participate in it unless their PTSD symptoms are fully stabilized. Dr. Rybicki acknowledged that "[f]orcing the child to participate can be counterproductive." Newell does not challenge the trial court's findings based on this testimony.

---

[3] Newell asserts that a parenting evaluation can be performed without the observational component. But Dr. Tutty testified that this was only recommended in cases involving a no-contact order between the parent and child, and would require other collateral information such as notes from supervised visitation.

2.3.26 Dr. Steve Tutty was called as an expert witness by the youth. Dr. Tutty is a clinical psychologist who works extensively with parents and children within the context of dependency cases. Dr. Tutty's testimony was credible and given substantial weight.

2.3.27 Dr. Tutty testified that reunification therapy, which comes under the umbrella of family therapy, is generally not accepted in the psychology field. He testified that this type of therapy can be difficult, outcomes can be negative, and it is particularly difficult to have positive therapeutic results if one party feels forced into participating in the therapy. Importantly, the youth in this case has clearly stated that he does not wish to reunify with Ms. Newell, and he does not wish to participate in reunification counseling or therapy.

We also accept these findings as verities. These findings, coupled with the other substantial evidence in the record, support the trial court's conclusion that the Department offered or provided all necessary and reasonably available services to Newell.

IV

Newell additionally contends that the trial court erred in finding that she was unfit to parent L.A.N. She notes that at the time of the termination trial, she had a full-time job, her own apartment, and was caring for her youngest child without Department intervention.

In addition to the statutory prerequisites in RCW 13.34.180(1), the State must also prove that the parent is "currently unfit to parent." In re Parental Rights to B.P., 186 Wn.2d 292, 312, 376 P.3d 350 (2016). In order to prove unfitness, the State must show that the parent's deficiencies make him or her incapable of providing "'basic nurture, health, or safety.'" B.P., 186 Wn.2d at 313 (internal quotation marks omitted) (quoting In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2004)). This requires a consideration of "whether a parent is

11

capable of parenting the *particular* child given the child's specific, individual needs." K.M.M., 186 Wn.2d at 490 (emphasis added).

Newell was not capable of parenting L.A.N. She had no relationship with him, and, more importantly, L.A.N. was unwilling to develop one with her. L.A.N., due to his history of abuse and neglect, had a particular need for consistency and stability. The history of this case shows that Newell was unable to provide this for him. The trial court's finding of unfitness was supported by the evidence.

Affirmed.

We concur: