FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JUNE 4, 2020

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 4, 2020

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Parental Rights to D.H., S.T., L.L, and T.L., | ) ) ) | No. 97311-3 |
| Minor Children. | ) ) | |
| B.B., | ) ) | En Banc |
| Petitioner, | ) ) | |
| v. | ) ) | |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | ) ) ) ) | |
| Respondent. | ) ) ) | Filed June 4, 2020 |

JOHNSON, J.— This case concerns whether the Department of Social and

Health Services[1] (Department) fulfilled its statutory obligation under RCW

---

[1] Subsequent to the filing of this case, on July 1, 2018, the powers, duties, and functions of the Children's Administration within that department were transferred to the newly formed Department of Children, Youth, and Families. RCW 43.216.906. For the purposes of this case, DSHS will be referred to as the Department.

13.34.180(1)(d) to provide a mother necessary services before terminating her parental rights. B.B., the mother of D.H., S.T., L.L., and T.L., had her parental rights terminated after a nearly three-year long dependency. B.B. contends that the Department failed to provide her timely dialectical behavior therapy (DBT) and neuropsychological services and that the parenting education services she received were not properly tailored to her mental health needs. A Court of Appeals commissioner affirmed the termination, finding that the Department provided and properly tailored all necessary services to B.B. We affirm the termination of B.B.'s parental rights. Substantial evidence supports the trial court's finding that all necessary and ordered services were offered or provided.

## FACTS

B.B. is the mother of four young children: D.H., S.T., T.L., and L.L., who are now between the ages of 4 and 11 years old. The Department first became involved with the family in 2009. Before filing for dependency, the Department had received 11 referrals regarding neglect, lack of hygiene, unsanitary living conditions, drug use, and domestic violence.

There were serious concerns about the physical condition of the home. On numerous visits, the home was laden with garbage, animal feces, and decay; visitors reported palpable stenches when they approached the home. The children were often soiled and unkempt; on multiple occasions, they were observed as

underdressed during cold weather. The Department also identified safety concerns. The physical environment posed health and safety risks, and abuse was also prevalent in the home. Joseph Lewis, the father of T.L. and L.L., regularly perpetrated abuse toward B.B. She had obtained a no-contact order against him, but a Department investigation revealed that Lewis had remained in the home and fathered L.L.

The parents were also unable to adequately address the children's health and well-being. The older children's school officials voiced concern about the lack of regular attendance, which persisted. Additionally, the children experienced various health issues and did not receive prompt medical care. The children also exhibited behavioral issues that required heightened care, which was not provided in the home.

The evidence presented at the termination trial outlines the family's long history of department involvement and the numerous efforts made to resolve B.B.'s parental deficiencies. Before this dependency petition was filed, B.B. received a variety of services from the Department, including therapy, Family Preservation Services, and Homebuilders. Early department intervention was unsuccessful, and after repeated intakes, home visits, educational services, and counseling, the three older children were removed from B.B.'s care in June 2015, and L.L. was removed in August 2015, just a few days after she was born. They

have not resided with B.B. since. B.B. agreed to the dependency; the three older children were found dependent in July 2015, and the youngest child was found dependent in September 2015. The parental deficiencies identified included unsanitary living conditions, unsafe exposure to domestic violence, and the parent's inability to address the children's medical needs.

*Dependency*

Throughout the three-year dependency period, B.B. engaged in primarily supervised visitation with the children. She also received various counseling and educational services: Promoting First Relationships, Positive Parenting Program, hands-on parenting instruction, Parent Protection group, individual counseling, and domestic violence victim treatment. The court also ordered B.B. to receive a psychological evaluation and to follow recommendations, participate in mental health counseling, and engage in parenting education. Both a psychological and a neuropsychological evaluation were completed.

In October 2015, B.B. received the psychological evaluation from Dr. Whitehill to assess her parenting abilities. The evaluation report largely identified areas of concern: B.B. lacked a proper understanding of the children's developmental needs, was unable to divide her attention between children appropriately, lacked authority, and did not fully understand her own deficiencies.

Dr. Whitehill recommended a neuropsychological evaluation to determine her comprehension ability.

The Department followed Dr. Whitehill's recommendation and issued three referrals for a neuropsychological evaluation. The Department issued the first referral in February 2016 and a second referral in June 2016. B.B. scheduled an appointment but failed to attend due to a conflict with a visitation. The Department then issued a third referral in July 2016. The date of the appointment is unknown, but B.B. attended. Dr. Shepel, the neuropsychologist, issued her evaluation report in November 2016.

Dr. Shepel determined that B.B.'s level of functioning was overall average, but B.B. was found to be performing below average in a variety of skills, particularly she was unable to notice visual safety risks to her children. Dr. Shepel's report noted that "[a]lthough cognitively . . . capable of learning and understanding of the developmental needs and her children's difficulties, she may not be able to actually apply her knowledge in the real life situations." Sealed Ex. 78, at 16. Among other treatments, Dr. Shepel recommended that B.B. attend a DBT group for 12 months to utilize cognitive methods "to implement safe personal boundaries, and to restructure the black-and-white thinking, procrastination, avoidant behaviors, and to learn to accept responsibility for her choices with

increased honesty and insight into her past dysfunctional behaviors." Sealed Ex. 78, at 16-17.

B.B.'s social worker referred her to DBT, but it was not available because the local provider lacked qualified staff. The social worker understood that B.B. would be contacted when it was made available. He also contacted other providers in the general area, and none were offering DBT. Once the service became available in February 2018, B.B. began participating.

During the dependency, B.B. also received a variety of counseling and education services to improve her parenting skills. Cynthia Dyrnes treated B.B. for most of the dependency until trial. In July 2015, Dyrnes began facilitating Parenting Protection group. The treatment focused on teaching B.B. accountability and responsibility for the effect of her actions on the children. After B.B. completed the program in July 2016, Dyrnes provided individual counseling primarily to treat B.B.'s anxiety, stemming from PTSD (post-traumatic stress disorder) and childhood abuse. Dyrnes observed that B.B.'s anxiety manifests in a "shutdown," where she feels overwhelmed and unable to function. Verbatim Record of Proceedings (VRP) (Mar. 7, 2018) at 78. Dyrnes utilized cognitive behavioral therapy to help B.B. reduce stress and anxiety and to improve her focus, concentration, decision-making, and organization. She also testified that B.B.

progressed after receiving PTSD medication and an antidepressant for approximately a year.

B.B. engaged in the Positive Parenting Program with Noel Villarivera from August 2016 to February 2017. Villarivera observed that B.B.'s main deficiencies were her primary focus on her infant, L.T., her feeling overwhelmed during visitation when all the children were present, her failure to apply proper disciplinary skills, and her anger. Although Villarivera testified that he believed B.B. understood the proper parenting skills, she was unable to apply them during visitation, so she did not graduate from the program.

B.B. also participated in Promoting First Relationships, counseling, and Family Preservation Services with Brenda Sullens. Sullens provided Promoting First Relationships for six months, focusing on B.B.'s parenting of the infant, L.T. She then provided Family Preservation Services for three months from December 12, 2017 to March 28, 2018. Sullens testified that the training was individualized to address B.B.'s disciplinary ability, provide her with knowledge of the children's developmental needs, and improve her relationship with the children. Consistent with the observations of the other providers, Sullens observed that B.B. was unable to balance her time among all the children.

Despite B.B.'s participation in services, the parenting issues persisted. The children's guardian ad litem observed at least 20 visitations, some as recent as

three weeks before trial, and he described the visits with all four children present as chaotic and overwhelming. Visits were reduced to three and later two children at a time. He observed that B.B. tended to self-isolate with the infant, L.T. In 2017, visitation was held once in a public setting, but it was hazardous and unsuccessful, so visitation was moved back to the facility. Attempts to expand or modify visitation proved largely unsuccessful in addressing B.B.'s parental deficiencies.

In later visitations, Sullens noticed some positive progression in B.B.'s abilities where visitation was reduced to one or two children. However, B.B. continued to struggle with providing discipline, balancing her attention among the children, and understanding children's social and emotional needs. Sullens opined that without assistance, B.B. could not consistently apply the appropriate skills to resolve the parental deficiencies. Sullens testified at trial that B.B. would not be able to successfully manage all four children in a less restricted form of visitation.

*Termination Proceedings*

In November 2016, the Department petitioned for termination of B.B.'s parental rights to all four children. In the petition, the Department identified B.B's deficiencies as her inability to parent safely and effectively and her failure to protect her children. Trial was originally set for January 2017 and was continued at least four times. A consolidated trial began in early March and continued in mid-

April 2018. In July 2018, the trial court terminated B.B.'s parental rights. At the time of termination, the children were between the ages of two and nine years old.

On appeal, B.B. challenged the trial court's finding that the Department fulfilled its statutory obligation under RCW 13.34.180(1)(d). B.B. claimed that the termination of her parental rights should be reversed because of the delay in DBT, delay in the neuropsychological evaluation, and the improper tailoring of the parenting education to her mental health needs. A Court of Appeals commissioner issued a ruling affirming the termination, determining that substantial evidence supported the trial court's findings. B.B. then sought discretionary review. We granted review.

ANALYSIS

Our role in reviewing a trial court's decision to terminate parental rights is limited to assessing whether substantial evidence supports the trial court's findings. *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 477, 379 P.3d 75 (2016). The trial court's findings will not be disturbed unless there is an absence of clear, cogent, and convincing evidence in the record. We defer to the trial court's weighing of the evidence and witness credibility determinations.

To terminate parental rights the Department must first establish the six elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i). Second, the Department must prove that termination is in the

best interests of the child. RCW 13.34.190(1)(b). At issue in this case is whether the first prerequisite was met; that is, whether the Department satisfied the elements of RCW 13.34.180(1).

B.B. challenges one element of RCW 13.34.180(1): whether the Department satisfied its statutory obligation under RCW 13.34.180(1)(d) to provide all necessary and court ordered services. Under this provision, the Department must establish

> [t]hat the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

RCW 13.34.180(1)(d). A "necessary service" is a service "'needed to address a condition that precludes reunification of the parent and child,'" and may include counseling, mental health treatment, and educational programs. *K.M.M.*, 186 Wn.2d at 480 (quoting *In re Dependency of A.M.M.*, 182 Wn. App. 776, 793, 332 P.3d 500 (2014)). Where, as here, the claim is that the Department failed to offer or provide a service, termination is appropriate if the service would not have remedied the parental deficiency in the foreseeable future. RCW 13.34.180(1)(d).

Here, the trial court found that all "services ordered to the mother under RCW 13.34.136 have been expressly and understandably offered or provided" and "all necessary services capable of correcting the mother['s] . . . parental

10

deficiencies in the foreseeable future were offered." Sealed Clerk's Papers (CP) T.L. at 216, 218. B.B. challenges the adequacy of three services she received throughout the dependency—DBT, a neuropsychological evaluation, and parenting education. First, she argues that her parental rights were terminated prematurely before her completion of DBT group. Second, she asserts that the Department failed to provide a timely neuropsychological evaluation. Third, she argues that the parenting services she received were not properly tailored to her mental health needs.

I. Length of DBT Group Treatment

The statute requires the Department to offer or provide "services ordered under RCW 13.34.136 . . . and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d). As a threshold matter, B.B. characterizes DBT as a service ordered under the permanency plan, RCW 13.34.136, instead of a necessary service. B.B. argues for a statutory interpretation that ordered services are not subject to the "reasonably available" and "capable of correcting the parental deficiencies within the foreseeable future" limitations.

In a dependency, the court orders services under the permanency plan and modifies the plan over time. RCW 13.34.136(5). The first dependency review hearing order required B.B. to "engage in [a] neuropsychological [evaluation] &

follow recommendations." Sealed S.T. Ex. 35, at 10. Subsequently, the permanency plan was modified and the "follow recommendations" language was omitted. By the time a neuropsychological evaluation was completed and DBT was recommended in November 2016, it was no longer a part of the permanency plan. Thus, the inquiry is whether DBT was a necessary service, reasonably available, and capable of correcting B.B.'s parental deficiencies within the foreseeable future.

B.B. raises two issues with the Department's provision of DBT, which she received in February 2018, over a year after it was recommended in November 2016. She argues that the Department failed its obligation because (1) DBT was delayed for over a year and (2) her rights were terminated prematurely before she completed DBT.

First, B.B. argues that the Department did not provide her all necessary services because DBT was delayed. The Department contends that DBT was not reasonably available during the period of delay. The Department must provide necessary services that are "reasonably available." RCW 13.34.180(1)(d). The dissent overlooks this statutory limitation and expands the Department's duty too far. The statute outlining permanency plan requirements expounds that the "department shall provide all reasonable services that are available within the department, or within the community, or those services which the department has existing contracts to purchase." RCW 13.34.136(2)(b)(vii).

During the dependency, B.B. received her parenting services and attended visitation in Shelton, Washington. B.B.'s assigned social worker testified that once he received Dr. Shepel's report recommending DBT, he attempted to enroll B.B. in DBT with several local service providers. But no providers in the general area were providing DBT group at the time, and B.B. made no request for an alternative provider. The social worker organized the referral so that B.B. would be enrolled once the service became available. When the service became available with a local provider in February 2018, B.B. began participating. The record is void of any evidence that DBT was otherwise available in the local community prior to February 2018. The record also indicates that it was reasonable for the services to be provided in Shelton. The dissent speculates that B.B. may have been willing to travel further for DBT but ignores the fact that public transportation to a remote treatment provider would have been unreasonable. For six months of the dependency, B.B. testified that she lived in Aberdeen, Washington and made regular six-hour trips to Shelton for services and visitation. B.B. told her counselor that these exhaustive transportation times negatively affected her ability to secure employment. Substantial evidence supports that, here, the Department was not statutorily obligated to provide DBT during the period of delay because it was not reasonably available.

Second, B.B. contends that her rights were terminated prematurely. Her strongest argument is that although the Department's neuropsychological evaluation recommended DBT, she was not given the opportunity to complete the treatment. By the time of trial, she completed one month of DBT. The Department argues that it was not obligated to provide a longer period of DBT before proceeding with termination because the treatment was not capable of correcting B.B.'s parental deficiencies within the foreseeable future.

While B.B.'s argument is compelling, the statutory authority and substantial evidence support the trial court's findings. RCW 13.34.180(1)(d) requires the Department to offer treatments capable of correcting the parental deficiencies within the foreseeable future. In *In re Parental Rights to B.P.*, 186 Wn.2d 292, 317-18, 376 P.3d 350 (2016), we reversed a termination and reasoned that where the mother successfully remedied her underlying deficiencies and the remaining deficiency was the child's detachment, the State could not terminate parental rights on that basis without first providing attachment services. Although the Department cited and relied on the lack of attachment as grounds for termination, it failed to provide any form of attachment services.[2] We reasoned that if "there were

---

[2] Similarly, in *In re Dependency of T.L.G.*, 126 Wn. App. 181, 199-201, 108 P.3d 156 (2005), the Department cited the parent's mental health needs as an issue without identifying any connected parental deficiencies but, nonetheless, delayed mental health evaluations and failed to provide referrals for any mental health services until right before trial.

evidence that [the mother] had not progressed in treatment as expected . . . , then the State's actions might be reasonable," but we found it significant the mother had successfully completed all other services. *B.P.*, 186 Wn.2d at 320. Her prior success supported that she also had a reasonable probability of resolving the attachment deficiency with attachment services. Thus, in that case, all necessary services capable of correcting the parental deficiencies within the foreseeable future were not offered or provided.

In contrast, the Department provided B.B. with various forms of treatment to resolve her identified parenting deficiencies, and the services were ultimately unsuccessful. B.B. made minimal progress in improving her parenting skills since the Department's involvement with B.B. began in 2009. B.B.'s prevailing deficiencies were the unsanitary living conditions, exposure to domestic violence, and her inability to address the children's safety and medical needs. Before the dependency action, the Department provided B.B. numerous services to improve her parenting, including Family Preservation Services, Homebuilders, and therapy. Despite these prefiling efforts, B.B.'s parental deficiencies continued, resulting in removal of the children and the filing of the dependency action.

During the course of the dependency, the Department identified that B.B.'s main deficiencies were her parenting skills and her inability to provide for the needs of all four children. The Department conducted evaluations and arranged

various forms of parenting education, individual treatment, and programs aimed at improving her parenting abilities, including individual counseling, Parenting Protection group, Family Preservation Services, Promoting First Relationships, Positive Parenting Program, domestic violence victim treatment, and mental health counseling and medication. Despite the array of services provided to address B.B.'s specific deficiency, her inability to care for her children, the court found that B.B. was unsuccessful at remedying her parental deficiencies.

The Department proceeded to termination because it was evident during supervised visitation that B.B.'s parental deficiencies continued. As the dissent recognizes, B.B.'s efforts to participate in these programs was commendable, but ultimately, she was still unable to implement appropriate parenting skills and meet her children's needs. The court found that visitation remained supervised in a controlled facility for essentially the entire dependency up until trial. Even in this restricted setting, visits were stressful, safety concerns remained, discipline was inconsistent, and B.B. was unable to balance her attention. B.B.'s counselors, the guardian ad litem, and visitation supervisors testified that B.B. showed little progress. In later visits, the social worker and providers opined that B.B. exhibited improved organization skills and structure, but B.B.'s ability to meet the social-emotional needs of the children, implement discipline, and maintain a safe environment persisted. Significant improvement was still needed for B.B. to

16

graduate to the next steps of unsupervised visitation or visitation in the community with all her children present. The social worker and Sullens testified that even with ideal progress from B.B., it would be at best a year before reunification was a realistic possibility.

In light of B.B.'s inability to resolve her parental deficiencies through the numerous services provided, the remaining inquiry is whether DBT specifically would have been capable of correcting B.B.'s parental deficiencies within the foreseeable future. RCW 13.34.180(1)(d). The dissent would also overlook this statutory requirement where here no evidence suggests that DBT, if completed, would have been capable of correcting B.B.'s parenting skills at all, let alone within the foreseeable future. The court identified B.B.'s prevailing deficiency as her inability to address the children's emotional and physical needs exemplified by her inability to implement parenting skills, maintain safe situations, address child autonomy, and execute consistent discipline. The DBT group was recommended to improve B.B.'s self-awareness, accountability for the actions that led to the dependency, and insight into her past behaviors. No evidence supports that DBT would have resolved B.B.'s inability to parent all four children safely in an uncontrolled environment. As discussed earlier, the providers and observers consistently testified that during supervised visitation B.B. showed little progress in her parenting skills. Substantial evidence supports the trial court's finding that

even in light of the incomplete DBT treatment, B.B. could not attend to her children's emotional or physical needs and her abilities were unlikely to change in the near future.

The record does not support that DBT was a particularly significant treatment. DBT was recommended as one of many treatments by Dr. Shepel, the neuropsychologist, but she did not discuss DBT in her trial testimony. No witness testified that DBT was the ideal treatment for B.B. The psychologist, Dr. Whitehill, generally testified that DBT "is widely seen as a treatment of choice for personality issues," but did not specifically recommend DBT for B.B. VRP (Apr. 17, 2018) at 469. As the Department argues, trial was continued numerous times, but the record does not reflect that a continuance was requested to allow for the completion of DBT.

There is simply no evidence that completion of DBT would be capable of resolving B.B's deficiency. B.B.'s primary parental deficiency was her parenting skills and, as discussed above, the Department provided numerous services aimed at remedying that deficiency. Ultimately, the services provided were unsuccessful, and the court did not find that it was in the children's best interests to delay trial further until B.B. completed DBT. The evidence suggests that a longer period of DBT was not capable of correcting B.B.'s underlying parental deficiencies within the foreseeable future. Substantial evidence supports the finding that the

18

Department fulfilled its statutory obligation to offer or provide all necessary services.

II. Timely Provision of the Neuropsychological Evaluation

B.B. contends that the Department failed its obligation under RCW 13.34.180(1)(d) because her neuropsychological evaluation was delayed by approximately a year. In October 2015, the psychological evaluation report recommended that B.B. also receive a neuropsychological evaluation. The Department made three referrals for a neuropsychological evaluation in February, June, and July 2016. The neuropsychological evaluation was completed in November 2016.

B.B. argues that the year-long delay violated the Department's obligation, and she relies on a set of cases where courts discuss the timely provision of services. However, these cases do not establish that the Department fails its obligation because of a delay alone. Rather, the cases establish that the Department fails to provide all necessary services where the earlier delay in one service creates a separate deficiency or results in an unaddressed deficiency in the course of termination proceedings. This occurs in instances where the Department takes a sequential approach and withholds a service or program and that decision engenders additional parent-child bonding and attachment issues. *In re Welfare of S.J.*, 162 Wn. App. 873, 875-76, 256 P.3d 470 (2011). Another situation is where

the delay results in the Department ultimately never providing the service. *See B.P.*, 186 Wn.2d at 297; *In re Welfare of C.S.*, 168 Wn.2d 51, 55-56, 225 P.3d 953 (2010). Neither situation exists here.

B.B. primarily relies on the holding of *S.J.*, where the mother's main deficiencies were unsanitary living conditions and drug use. 162 Wn. App. at 876. There, the Department delayed the mother's mental health treatment until she was sober, and by the time she remedied her deficiencies, her child had detached from her. The Department then failed to provide her attachment and bonding services and relied on the detachment as the basis for termination. *S.J.*, 162 Wn. App. at 884. The court reversed the termination because the mother remedied her initial parental deficiencies and the remaining issue, attachment, was exacerbated and ignored by the Department.

But unlike *S.J.* and the other cases cited where the delay led to something more, any delay here did not create a separate basis for termination or result in the complete failure to provide a necessary service. The Department provided three referrals after the evaluation was recommended. Even if the delay was attributed to the Department, B.B. received a neuropsychological evaluation approximately 15 months before trial. During that period, it also provided individual mental health counseling, Parenting Protection group, Family Preservation Services, Promoting First Relationships, Positive Parenting Program, and domestic violence victim

treatment. In large part, by the time she received the neuropsychological evaluation, B.B. was already participating in treatments that were recommended.

The record reveals that the evaluation was offered and completed with ample time for B.B. to follow the recommendations. Ultimately, even with the completion of these services, B.B. was unable to significantly improve her parenting skills during supervised visitation. Substantial evidence supports the trial court's finding that the delay "did not significantly impact" B.B.'s ability to correct her deficiencies; the Department fulfilled its statutory obligation. Sealed CP T.L. at 219.

III. Tailored Parenting Education

B.B. also argues that the Department failed to fulfill its statutory obligation because it did not properly tailor the parenting services to her cognitive needs. Within the prerequisite of RCW 13.34.180(1)(d), the services must be tailored to the needs of the individual. *In re Parental Rights to I.M.-M.*, 196 Wn. App. 914, 921, 385 P.3d 268 (2016). The Department is required "to identify a parent's specific needs and provide services to meet those needs." *I.M.-M.*, 196 Wn. App. at 924.

Substantial evidence in the record supports that the Department fully investigated her mental health needs and appropriately tailored services. B.B.'s main deficiency was her parenting skills. Accordingly, the court provided a

psychological evaluation with a parenting component, neuropsychological evaluation, mental health counseling, several parenting education courses, domestic violence support, and vocational training.

The neuropsychological evaluation determined that B.B. was cognitively capable of learning and understanding the material, her prevailing issue was applying the knowledge in real life situations. The neuropsychologist and B.B.'s counselors identified that this difficulty stemmed from her anxiety, which was treated with counseling. The neuropsychologist opined that to learn parenting skills B.B. would benefit most from repetition, role modeling, rehearsal and correction, and concepts broken down in parts. Once these specific needs were recognized, the providers actively applied them. Villarivera, the Positive Parenting Program instructor, worked with B.B. one-on-one, incorporated repetition, rehearsal and correction, and used the sessions to address B.B.'s weakest skills. Similarly, Sullens, the Family Preservation Services and Promoting First Relationships instructor, worked one-on-one and used role modeling with B.B. Sullens targeted her work on the areas where B.B. struggled: discipline, consistency, her relationship with her children, and any issues that arose during visits. The record supports that the Department identified B.B.'s specific needs and provided services tailored to those needs.

CONCLUSION

In this case, B.B. actively participated in all the services she was offered but was unable to resolve her parental deficiencies. While B.B. made consistent efforts to improve as a parent, the children need a safe, stable, and permanent home. We hold that substantial evidence supports the trial court's finding that the Department fulfilled its obligation to offer and provide all ordered and necessary services, reasonably available and capable of correcting her parental deficiencies in the foreseeable future, and affirm.

No. 97311-3

_[signature]_

WE CONCUR:

_Stephens, C.J._

_Owens, J._

_González, J._

_[signature], J._

_Wiggins, JPT_

24

*In the Matter of Parental Rights to D.H., S.T., L.L. & T.L.*

No. 97311-3

MADSEN, J. (dissenting)—In 2015, Department of Social and Health Services (DSHS)[1] removed four children, D.H., S.T., L.L., and T.L., from the care of their mother, B.B. During the subsequent dependency proceeding, B.B. worked hard to address her parental deficiencies despite the significant delay in obtaining the single most important mental health service recommended by her psychologist, dialectical behavior therapy (DBT). After more than a year of waiting, B.B. was finally able to engage in DBT. She was allowed only one month of this therapy before her parental rights were terminated.

The termination of parents' fundamental rights to the care and custody of their children should be allowed only for the most powerful of reasons. *In re Welfare of H.S.*, 94 Wn. App. 511, 530, 973 P.2d 474 (1999). The majority concludes that such reasons are present here. Yet it does so in the face of clear evidence to the contrary: the State failed to timely provide the necessary DBT service to B.B. as required under RCW

---

[1] As of July 1, 2018, responsibility for child welfare services was transferred from DSHS to the Department of Children, Youth and Families. RCW 43.216.906. I refer to the department as DSHS throughout this memo unless otherwise stated.

13.34.180(1)(d).[2] By upholding the termination action, the majority reinforces the detrimental notion that time is more important than family reunification. In short, the majority disregards the paramount goal of child welfare legislation—to reunite the child with his or her legal parents, if reasonably possible. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 577, 257 P.3d 522 (2011). I do not agree that sufficient evidence supports the termination of B.B.'s parental rights, therefore I respectfully dissent.

## FACTS

B.B.'s children were removed from her care primarily because of parental neglect. Throughout the dependency, B.B. suffered from multiple mental health challenges. A victim of child abuse and neglect herself, B.B. struggled with debilitating anxiety and post-traumatic stress disorder, she had trouble making decisions and problem solving, and she struggled with the fallout of domestic violence perpetrated by the father of two of her children. To address these challenges, the dependency court ordered B.B. to undergo psychological evaluation and to follow the evaluator's recommendations. B.B. did so. She was initially evaluated, began seeing a therapist, and attended parenting classes.

During this time, the first in a series of delays in services occurred. B.B. was not given a timely neuropsychological evaluation, which was delayed for over a year. When

---

[2] RCW 13.34.180(1)(d) provides,
> That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

at last B.B. was evaluated, she was found to have neurological issues impacting her parenting and a learning disability. In response, B.B.'s evaluator recommended that she engage in 12 months of DBT. The evaluator characterized this therapy as the "service of choice" for B.B. Verbatim Report of Proceedings (May 10, 2018) (VRP) at 889. Unfortunately, provision of DBT was also delayed.

Despite these delays, B.B. addressed her parental deficiencies. Combined with medication, her anxiety lessened and she began to address the trauma she suffered as a domestic violence survivor. B.B. also improved her parenting skills. B.B.'s therapist noted that medication contributed to her progress, allowing her to better divide her attention and discipline her children. Though B.B. struggled to effectively implement the skills she had learned to manage the behavior of her older children, she had no such challenges with her youngest child. B.B.'s supervised visits were hectic, but there was no concern about the safety of her children.

Prior to termination, B.B. did all that was asked of her. She completed the recommended classes, attended therapy, and took prescribed medications. She utilized every available resource. B.B. also utilized DBT when it finally became available—one month before DSHS successfully moved to terminate B.B.'s parental rights.

## ANALYSIS

I would reverse the termination in this case because the State failed to provide all reasonable and necessary services to correct B.B.'s parental deficiencies. RCW 13.34.180(1)(d).

3

To succeed in a termination action, the State must show that the six statutory requirements under RCW 13.34.180(1)(d) are established by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i). One of these requirements is that the State must identify and timely provide necessary services that are needed to address a condition precluding reunification. RCW 13.34.180(1)(d); *see also In re Dependency of T.L.G.*, 126 Wn. App. 181, 198-203, 108 P.3d 156 (2005); *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010). When the State suggests remedial services to a parent, it has a statutory obligation to, at minimum, provide the parent with a referral list of agencies or organizations that provide the services. *In re Welfare of Hall*, 99 Wn.2d 842, 850, 664 P.2d 1245 (1983).

In this case, the dependency court ordered B.B. to follow her psychological evaluator's recommendations. The evaluator recommended 12 months of DBT, noting that the therapy would be "very helpful" and would be "the service of choice" for B.B. in order for her to "restructure" her "black-and-white thinking, procrastination [and] avoidant behaviors," as well as to "learn to accept responsibility for her choices." VRP at 889; Sealed Ex. 78, at 16-17. DBT was a necessary service. RCW 13.34.180(1)(d).

A relevant decision is *T.L.G.*, 126 Wn. App. 198-203. In that case, the Court of Appeals held that the State failed to offer or provide all necessary services in part because "parental deficiencies were not identified, no treatment services were offered, and there [was] no finding [that] they would have been unable to benefit." *Id.* at 203.

4

Here, as in *T.L.G.*, the protracted delay in services "cannot be laid solely (or even mostly) at" B.B.'s feet. *See id*. at 201. In October 2015, B.B.'s psychologist recommended she undergo a neuropsychological evaluation. She was referred for the evaluation in February 2016. DSHS attributed this four-month delay to a change in her assigned social worker. The record does not explain why the exam was not completed. In June 2016, DSHS again referred B.B. for the evaluation, but the appointment date conflicted with a scheduled visitation; B.B. chose her children over the evaluation. The third referral occurred on July 19, 2016, and the evaluation was finally completed in November, at which point DBT was recommended.

Unfortunately, the delays continued. While DSHS provided B.B. with a referral list for parenting classes and therapy, the only recommended resource center for DBT did not offer the service. Nor did any other provider in the area. B.B. was told she would receive DBT at the local resource center as soon as a provider became available; this did not occur until February 2018. There is no indication DSHS sought providers outside the immediate area.

As the record shows, B.B. was not to blame for the dilatory provision of services. The initial four-month delay in B.B.'s neurological evaluation occurred due to DSHS's internal decision to reassign her social worker. Apart from rescheduling one appointment in order to visit her children, B.B. attended all scheduled appointments with her evaluator.

5

Even if one rescheduling could shift some responsibility for the delay to B.B.'s shoulders, the protracted delay in DBT can be laid only at the feet of DSHS. The State has the statutory duty to *at minimum* provide the parent with a referral list of agencies or organizations that provide necessary services. *Hall*, 99 Wn.2d at 850. In this minimal duty, the State failed. DSHS identified one service provider and proceeded to wait for that provider to begin offering the service at some point in the future. This action conflicts with the State's duty to refer a parent to an agency that can realistically provide that service. *Id.*

The majority, however, concludes that DSHS was not statutorily obligated to provide DBT during the period of delay because it was not reasonably available. Majority at 13. It is worth noting that the trial court did not make a finding that DBT was not reasonably available. Indeed, the court did not address it at all. It is the State's responsibility to prove that this necessary service was not reasonably available and, as shown above, the State did not do so here. RCW 13.34.180(1)(d).

Nevertheless, the majority relies on two facts in the record that support its conclusion. First, that B.B. spent much of her time during dependency traveling from her home in Aberdeen to Shelton in order to attend the recommended classes and could not realistically travel to a remote treatment provider. Majority at 13. Second, that DSHS tried but could not secure DBT in the area where B.B. was living. *Id.*

I disagree with the majority's characterization of the record and the conclusion the majority draws from it. The majority is incorrect that for B.B., transportation to a remote

treatment provider would have been unreasonable. *Id.* Though B.B spent much of her time traveling, there is no evidence she could not or would not travel farther to utilize the "service of choice" recommended by her therapist. VRP at 889. Rather, the record states expressly that B.B. was willing to put in the work toward reunification even though she recognized it may have been too late to get her children back. B.B.'s willingness to travel for much of her day to a location that provided the necessary services does not support the majority's statement that it was unrealistic for her to travel to other locations to utilize DBT.

Similarly, the absence of a qualified DBT provider in B.B.'s area does not mean it was not reasonably available. Gaps in medical care are not uncommon occurrences for rural communities. *See, e.g.*, GRAYS HARBOR COUNTY TASK FORCE ON HEALTH, COMMUNITY HEALTH NEEDS ASSESSMENT: GRAYS HARBOR COMMUNITY HOSPITAL 1, 7 (2013), https://www.ghcares.org/media/1187/ghch_community_health_needs_assessment.pdf [https://perma.cc/3DJZ-XDGA] (noting the severe shortage of physicians in rural Grays Harbor County). The need for rural mental health care is especially acute. *Rural Mental Health*, RURAL HEALTH INFO. HUB, https://www.ruralhealthinfo.org/topics/mental-health [https://perma.cc/GL39-DA4Q] (last visited May 29, 2020) (noting the long distances rural residents must travel to receive services and chronic shortages of mental health professionals outside urban communities). Rural communities have used creative solutions to meet this need, such as expanding telemental health services. *Id.* But where

no resources are available, health care professionals refer patients to facilities outside the community. *Id.*

In this case, DSHS did not follow the lead of rural health care providers. There is no evidence that DSHS looked to other solutions to provide the necessary DBT service to B.B., specifically, referring her to facilities outside her community and general area. While the challenges in locating health care for rural patients can be formidable, they pale in comparison to the effect of not providing such care to parents facing the termination of their fundamental rights. Government must be held to a higher standard in termination cases.

The majority reasons away the significant delay in providing DBT by listing all the *other* treatments provided and noting the ways in which B.B. did not sufficiently improve her parental deficiencies. *See* majority at 14-16. B.B. was offered and participated in parenting classes and cognitive behavioral therapy. Yet she was not given the therapy her evaluator specifically recommended until one month before the termination trial began. Personal counseling is not equivalent to the targeted DBT service that would have helped B.B. "restructure" her "black-and-white thinking, procrastination [and] avoidant behaviors" as well as "learn to accept responsibility for her choices." Sealed Ex. 78, at 16-17.[3] The majority ignores these rationales from B.B.'s

---

[3] The majority dismisses the importance of DBT as a "particularly significant treatment" for B.B. Majority at 18. In doing so, the majority highlights the lack of trial testimony to that effect. *Id.* Yet the record shows Dr. Tatyana Shepel recommended DBT in order to address specific parental deficiencies and mental health challenges: black-and-white thinking, procrastination,

therapist and instead points to B.B.'s lack of progress given *other* services to hold that the

failure to timely provide DBT is excusable. It is not.

The majority also affirms the trial court's finding that B.B. is unlikely to be able to

parent in the near future. RCW 13.34.180(1)(d) requires necessary reasonably available

services capable of correcting parental behavior to do so in the "foreseeable future." The

period of time constituting the "'foreseeable future' depends in part on the age of the

child." *Hall*, 99 Wn.2d at 851. Here, the court's foreseeable future finding was days or

weeks for B.B.'s children. But no witness testified and the court made no finding that

B.B. could not benefit from DBT. Relying on a parent's "*possible* incapacity" to benefit

from DBT is insufficient grounds for termination. *See In re Parental Rights to B.P.*, 186

Wn.2d 292, 319, 376 P.3d 350 (2016). Furthermore, without testimony on the effect of

DBT services, we cannot know what B.B.'s timeline would be to correct her parenting

skills.

Apart from B.B.'s specific parenting deficiencies and the work she did to address

them, it is also important to consider the reason her children were removed from her

care—parental neglect. B.B.'s home was often in disarray, dirty, unorganized, and

insufficiently "child-proofed." Her children were reported as similarly unkempt and

sometimes in ill health. B.B.'s challenges consisted of depression and anxiety, among

---

avoidant behaviors, and lack of acceptance of responsibility for B.B.'s actions. This evidence is clear from Dr. Shepel's report. Trial testimony on this topic would have no doubt been helpful to B.B.'s case, but it does not detract from its importance in the record before us.

other mental health concerns, which translated into an inability to do everyday tasks, such as keep a clean house and attend to her children's many needs. Yet this was not a case of physical abuse by B.B. against her children. This type of parental deficiency does not cry out for removal due to imminent harm to the children, rather it is one that lends itself to skill based training and in-home assistance. Removal based on neglect and B.B.'s own experience as a victim of parental abuse contribute to my view that additional effort was warranted to break the cycle of removal and termination.

In light of the record before the court, I would hold that the State failed to provide DBT, a necessary service, and did not prove that B.B. would be unlikely to be able to parent in the near future. RCW 13.34.180(1)(d). Therefore, the State did not satisfy the legal requirements to terminate B.B.'s parental rights and the termination should be reversed.

Not only is today's decision incorrect as it applies to B.B., it serves to reinforce the harmful notion that removal is better for children than reunification. This court's decision continues down the unfortunately well-trodden path of other courts that consider only whether a child is harmed while in a parent's care—at the expense of the trauma created by removal. I write separately to emphasize the grave consequences wrought by termination in the hope of changing the conversation on child welfare away from the default of removal back to the importance of family reunification.

I begin by reviewing the emotional, psychological, and physical harm of separation on children.[4]  Family separation has led to "catastrophic" results due to the trauma of dividing a child from a parent.  *See* Shanta Trivedi, *The Harm of Child Removal*, 43 N.Y.U. REV. L. & SOC. CHANGE 523, 525 (2019).  Recent studies have shown the harmful, long-term effects of trauma on children's brains.  Children separated from their parents at a young age have been found to have less white and gray brain matter—fibers that transmit information throughout the brain and brain-cell bodies that process information and solve problems.  *See* William Wan, *What Separation from Parents Does to Children: "The Effect is Catastrophic,"* WASH. POST, June 18, 2018, https://www.washingtonpost.com/national/health-science/what-separation-from-parents-does-to-children-the-effect-is-catastrophic/2018/06/18/c00c30ec-732c-11e8-805c-4b67019fcfe4_story.html [https://perma.cc/6J8M-5GTL].  For children separated within the first two years of their lives, the damage is even worse.  These children scored lower

---

[4] *See, e.g.*, Allison Eck, *Psychological Damage Inflicted by Parent-Child Separation is Deep, Long-Lasting*, NOVA NEXT (June 20, 2018), https://www.pbs.org/wgbh/nova/article/psychological-damage-inflicted-by-parent-child-separation-is-deep-long-lasting/ [https://perma.cc/2G3B-K5S6] (quoting a psychiatric epidemiologist who states, "The scientific evidence against separating children from families is crystal clear . . . .  No one in the scientific community would dispute it"); Sara Goudarzi, *Separating Families May Cause Lifelong Health Damage*, SCIENTIFIC AMERICAN (June 20, 2018), https://www.scientificamerican.com/article/separating-families-maycause-lifelong-health-damage/ [https://perma.cc/A8ZB-8329] (documenting the potential long-term effects of family separation on children, including developmental regression, difficulty sleeping, depression, and acute stress); *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*, 319 F. Supp. 3d 491, 503 (D.D.C. 2018) (noting research indicating that the effects of separation can be so extreme that "children may experience high rates of post-traumatic stress disorder, anxiety, depression, and suicidal ideation, in addition to developmental delays or poor psychological adjustment").

on IQ (intelligence quotient) tests, their fight-or-flight response appeared broken, and situations that would generally create physiological responses in other people would not do so for these children. *Id.* The American Academy of Pediatrics (AAP) has noted that family separation "'can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short- and long-term health. This type of prolonged exposure to serious stress—known as toxic stress—can carry lifelong consequences for children.'" Trivedi, *supra*, at 526 (quoting Press Release, Colleen Kraft, Am. Acad. of Pediatrics, AAP Statement Opposing Separation of Children and Parents at the Border (May 8, 2018), https:www.aap.org/en-us/abouttheaap/aap-press-room/Pages/StatementOpposingSeparationofChildrenandParents.aspx [https:perma.cc/25QX-B2ZA] at n.10).

This comes as no surprise to the scientific community. Studies from the 1940s showed the negative effects of family separation on children. *Id.* at 528. The psychological attachment between a parent and a child is so strong that even after placement with a foster family after maltreatment from the biological parents, children long to return to them. *Id.* Separation is especially detrimental for newborn children because it severs the bonding period after birth and allows for no physical, "skin-to-skin" contact with mothers. *Id*. at 529. Separation is not limited to the parent and child, but often extends to the child and his or her siblings. *Id*. at 532-33.

Further harm can be created by the "act of removal itself," as well as a child's entry into the foster care system. *Id*. at 531-32, 541-52 (detailing the abuse, neglect,

placement instability, and physical and sexual health problems for children in foster care); Vivek Sankaran, Christopher Church & Monique Mitchell, *A Cure Worse Than the Disease? The Impact of Removal on Children and Their Families*, 102 MARQ. L. REV. 1161, 1166-70 (2019) (discussing the trauma of removal and placement in foster care for children and their parents). For fiscal year 2018, over 430,000 children were in foster care; only 125,000 of those children were waiting to be adopted. U.S. DEP'T OF HEALTH & HUMAN SERVS., THE AFCARS [Adoption and Foster Care Analysis and Reporting System] REPORT 1 (2019), https://www.acf.hhs.gov/sites/default/files/cb/afcarsreport26.pdf [https://perma.cc/7PDS-UCH8]. One study has found that for each year a child spends in foster care after termination of parental rights, the likelihood of adoption is reduced by 80 percent. Lashanda Taylor, *Resurrecting Parents of Legal Orphans: Un-Terminating Parental Rights*, 17 VA. J. SOC. POL'Y & L. 318, 325-26 (2010). The many and varied forms created by family separation has led one court to recognize that the damage caused by removal "may be 'more damaging to the child than doing nothing at all.'" Trivedi, *supra*, at 528 (internal quotation marks omitted) (quoting Lynn F. Beller, *When in Doubt, Take Them Out: Removal of Children from Victims of Domestic Violence Ten Years after* Nicholson v. Williams, 22 DUKE J. GENDER L. & POL'Y 205, 216 (2015)).

Time has been a driving force in dependency and termination cases. *E.g.*, RCW 13.34.180(1)(d) (requiring the provision of "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future"); *Hall*, 99

Wn.2d at 851 (the period of time constituting the "'foreseeable future' depends in part on the age of the child"). Considering the thousands of removed children awaiting adoption coupled with the low probability of adoption against the time it will take to rehabilitate the parent may actually favor continuing dependency of children as opposed to terminating parental rights.

The decision to terminate B.B.'s parental rights is emblematic of the old way of thinking—that time matters more than reunification. Yet our state child welfare statutes have consistently recognized that the family unit should be nurtured and remain intact but for extreme situations calling for separation. *E.g.*, RCW 13.34.020 ("Legislative declaration of family unit as resource to be nurtured") (boldface omitted); *State ex rel. Bulmon v. Superior Court for Kitsap County*, 21 Wn.2d 536, 537, 151 P.2d 987 (1944); *In re Parental Rights to K.J.B.*, 187 Wn.2d 592, 597, 387 P.3d 1072 (2017) (the paramount goal of child welfare legislation is to reunite the child with the legal parents).

The prominence of time over reunification of the family has recently undergone a sea change. In 2018, Congress passed, and the president signed, the Family First Prevention Services Act (Family First) as part of the Bipartisan Budget Act of 2018. Pub. L. No. 115-123, 132 Stat. 232 (2018). The primary goals of Family First is to break the cycle of child removal, change the role of foster care so that placements are supportive of families rather than a substitute for them, and institutes a more "trauma-informed" approach to core practices, especially surrounding removal. Fabiola Villalpando, *Family First Prevention Services Act:  An Overhaul of National Child*

14

*Welfare Policies*, 39 CHILD. LEGAL RTS. J. 283, 283-84 (2019). Because removal is traumatic for children and parents, Family First focuses on practices that help keep families together. *Id.*

One of the major areas of change under Family First is the way states may spend Title IV-E funds. Pub. L. No. 115-123, § 50702. Beginning October 1, 2019, states may use federal Title IV-E funds for prevention services that would allow foster care candidates to stay with their parents or relatives. Family First Prevention Services Act: Prevention, DEP'T OF CHILD., YOUTH & FAMILIES, https://www.dcyf.wa.gov/practice/practice-improvement/ffpsa/prevention [https://perma.cc/2AJM-8R6R]; Family First Prevention Services Act, NAT'L CONF. OF STATE LEGISLATURES, http://www.ncsl.org/research/human-services/family-first-prevention-services-act-ffpsa.aspx [https://perma.cc/767G-ML88].

Washington adopted Family First in 2019. LAWS OF 2019, ch. 172. The Department of Children, Youth and Families continues its mission of "increasing families' access to supportive services *prior to formal child welfare involvement*." Family First Prevention Services Act, DEP'T OF CHILD., YOUTH & FAMILIES, https:www.dcyf.wa.gov/practice/practice-improvement/ffpsa [https://perma.cc/H45W-PRSR] (emphasis added). The law "shift[s]" how the department thinks about families, "preserving families, and supporting them before a child is removed from the home." S.B. REP. ON H.B. 1900, at 6, 66th Leg., Reg. Sess. (Wash. 2019).

The passage of the Family First Act is evidence of the state and federal reorientation in child welfare law. Lawmakers now recognize what the mounting evidence on family separation has already demonstrated: that removal is simply not worth the crippling, long-term consequences to children or their parents. Instead of allowing the trauma of removal to continue, child welfare legislation should be guided by what has always been its paramount goal: family reunification. *K.N.J.*, 171 Wn.2d at 577.

In this case, however, removal is the order of the day. The majority justifies the separation of four children from the care of their mother because she improved her parenting skills too slowly and without the aid of necessary services. To this, I cannot agree. Termination was not proved, and the trial court's decision should be reversed. Moreover, we should take the unique opportunity presented by this case to reexamine our approach to termination in the context of the Family First Act. In so doing, it becomes clear that reunification for B.B. and her children was not impossible in light of the hard work and extraordinary efforts B.B. made to address her parental deficiencies.

This will no doubt be the first of many cases concerning the termination of parental rights and its interaction with the Family First Act. The majority does not confront the changing tide in child welfare legislation, but it is my hope that we will begin the necessary work to do so in future cases.

With these considerations in mind, I respectfully dissent.

Madsen, J.

Montoya-Lewis, J.

No. 97311-3

GORDON McCLOUD, J. (concurring in dissent)—I dissent because I do not agree with the majority's conclusion that sufficient evidence supports the termination of B.B.'s parental rights under our current, controlling case law. I therefore join pages 1-9 of the dissent.

*Gordon McCloud, J.*