IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Termination of the Parental Rights to:<br><br>E.J.O. | ) ) ) ) ) ) | No. 39266-0-III<br>(Consolidated with<br>No. 39267-8-III;<br>No. 39268-6-III;<br>No. 39269-4-III;<br>No. 39270-8-III) |
| In the Matter of the Termination of the Parental Rights to:<br><br>S.D.O. | ) ) ) ) ) | |
| In the Matter of the Termination of the Parental Rights to:<br><br>S.S.M.O. | ) ) ) ) ) ) ) | UNPUBLISHED OPINION |
| In the Matter of the Termination of the Parental Rights to:<br><br>J.O. | ) ) ) ) ) ) ) | |
| In the Matter of the Termination of the Parental Rights to:<br><br>K.M.O. | ) ) ) ) ) ) | |

PENNELL, J. — Z.O. challenges a juvenile court order terminating her parental

rights to five minor children. We affirm.

FACTS

Z.O. is the mother of eight children; the five youngest are involved in this

proceeding.[1] Z.O. had a traumatic childhood, marked by homelessness, sexual assault, and being surrounded by drug use. Her adult life has been similarly difficult. She has had recurring bouts of drug use and is frequently unhoused. She carries several mental health diagnoses, including persistent depressive disorder and a personality disorder. Z.O. also has low cognitive functioning and difficulty with auditory learning.

Z.O.'s history with the Department of Children, Youth, and Families started as a teenager when she had her first child. Z.O. struggled as a parent. In 2008, Z.O.'s oldest three children were placed in a guardianship with her mother.

In regard to this proceeding, the Department first initiated contact with Z.O. in 2011 after being contacted by the hospital where she gave birth to her son J.O.; the oldest child of the five children involved in the dependency proceedings. The Department received additional intakes when Z.O. tested positive for methamphetamine at the subsequent births of another son and two daughters. By 2016, the Department was receiving reports from day care staff that Z.O.'s children showed signs of abuse and neglect as well as reports from shelter staff and residents describing Z.O.'s physically and verbally abusive behavior toward the children.

---

[1] The fathers of the five children have all either voluntarily relinquished their parental rights or had them terminated by default.

In 2018, the Department initiated dependency proceedings regarding the four children who had been in Z.O.'s care. When Z.O.'s youngest child was born in 2019, Z.O. again tested positive for methamphetamine, and a dependency action was filed as to that child as well.[2] The Department's concerns focused on the impact of substance abuse and mental health on Z.O.'s ability to parent.

Early on in the dependency proceedings, Debra Brown, Ph.D., conducted a psychological evaluation of Z.O. at the request of the Department. Dr. Brown recommended Z.O. participate in dialectical behavior therapy (DBT) to address her personality disorder. Dr. Brown also recommended Z.O.'s cognitive impairments be accommodated by following up on oral instructions with "written information" and breaking information down into "small amounts and then checking back with her to see what she understood." 1 Rep. of Proc. (RP) (Jul. 12, 2022) at 306. According to Dr. Brown, Z.O.'s cognitive challenges were not as "glaring as her psychological problems." *Id*. at 298.

After the birth of her youngest child in 2019, Z.O. entered into an inpatient treatment program at a facility known as the Isabella House, a part of the New Horizon

---

[2] There was also testimony at the termination trial that four of the five children had tested positive for methamphetamine at birth.

Care Centers. The program lasted six months and Z.O. was able to live at Isabella House with her newborn. Upon successful completion of the inpatient program in April 2020, Z.O. moved into New Horizon's transitional housing with her baby. At that point, the Department was prepared to reunite Z.O. with two more of her children pursuant to a contested court order. However, that plan was aborted when Z.O. was removed from the transitional housing program due to violating COVID protocols and submitting a positive urinalysis test. The Department's social workers then tried to obtain placement for Z.O. at a transitional housing and treatment facility known as Anna Ogden Hall. However, Z.O. declined the placement, explaining "she did not feel she needed treatment anymore." 1 RP (Jul. 13, 2022) at 412. From that point on, Z.O. struggled to maintain housing and her youngest child was placed in foster care.

Despite declining placement at Anna Ogden Hall, Z.O. participated in intensive outpatient treatment (IOP) through New Horizon's chemical dependency program after her discharge from Isabella House. At the time Z.O. started IOP services with New Horizon, the Department believed the organization could also provide Z.O. with DBT, as had been recommended by Dr. Brown. However, it turned out New Horizon was not able to provide this type of service. Z.O. participated in cognitive behavioral therapy (CBT) and IOP through New Horizon, but she declined to pursue DBT through another

4

organization. Although the Department was not satisfied with the progress demonstrated by Z.O., New Horizon determined Z.O. had successfully met her individualized chemical dependency and mental health treatment goals and closed out her case.

Visitation between Z.O. and her children occurred throughout the dependency proceedings. Before Z.O. entered Isabella House, the visits were chaotic. There were concerns about drug use, and erratic and aggressive behavior. After her successful inpatient treatment at Isabella House, Z.O.'s behavior during sessions with the children improved. Nevertheless, her two older children did not respond favorably to visitation and ultimately requested not to participate in visits. And even though Z.O. demonstrated she was deploying "very positive and great" parenting skills, the children were not responsive. 1 RP (Jul. 11, 2022) at 119-20.

Z.O. specifically participated in a parenting program called Incredible Years with her three younger children from September 2021 until February 2022. Z.O. appeared to have benefitted from the program and was able to demonstrate new skills during her interactions with her children. However, by the end of her time with the program, Z.O. still needed to work on meeting her children's emotional needs. Although it was recommended that Z.O. continue to work on emotion coaching, Z.O. did not recognize in herself any deficits in parenting skills.

The Department filed petitions to terminate Z.O.'s parental rights in February 2020 and October 2021. A three-day termination trial was held in July 2022. At trial, the Department identified Z.O.'s current deficiencies as a lack of insight, untreated mental health, and poor parenting skills.

Z.O. testified at trial. During her testimony, she claimed her drug use did not have a negative impact on her children. She explained she was currently clean from drugs and did not think urinalysis testing was necessary. Z.O. denied mental health diagnoses as identified by Dr. Brown. Z.O. testified that she was "tired" of doing services because she had "done more than what . . . [was] asked." 1 RP (Jul. 13, 2022) at 356. Nevertheless, Z.O. recognized that if her children were returned to her care, the family would need some therapy and counseling.

After the conclusion of evidence, the trial court terminated Z.O.'s parental rights. The court found the Department's social workers had adequately accommodated Z.O.'s cognitive needs by providing instructions orally and in writing. The court recognized that Z.O. had made some progress during the dependency proceedings, but she nevertheless failed to complete necessary services. The court was most concerned that Z.O. had never even attempted to participate in DBT therapy. Given Z.O.'s untreated mental health needs, the court found Z.O. could not remedy her parental deficiencies in the foreseeable

future. The court therefore terminated parental rights as to all five children. Z.O. timely appeals.

ANALYSIS

Parents enjoy fundamental liberty interests in the continued care, custody, and companionship of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *see also Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). Termination of parental rights involves a two-step process. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). The first step focuses on the parent. It requires the Department to prove by clear, cogent, and convincing evidence the six termination factors set forth in RCW 13.34.180(1) along with the nonstatutory factor of current unfitness. *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 479, 379 P.3d 75 (2016). The second step focuses on the child. Under this portion of the analysis, the Department must establish, by a preponderance of the evidence, that termination is in the best interests of the child. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011); *K.M.M.*, 186 Wn.2d at 479. Only if the first step is satisfied may the court reach the second step. *A.B.*, 168 Wn.2d at 911.

Z.O. challenges the juvenile court's finding that the Department offered or provided "all necessary services, reasonably available, capable of correcting the parental

deficiencies within the foreseeable future." RCW 13.34.180(1)(d). She makes two claims. First, she contends the Department failed to offer appropriate services because it never adequately investigated her cognitive impairment. Second, she argues that to the extent Dr. Brown's assessment amounted to an adequate investigation, Dr. Brown's recommended accommodations were not shared with the service providers who worked with Z.O.

We review a trial court's findings under RCW 13.34.180(1) for substantial evidence, bearing in mind the demanding standard of proof. *In re Parental Rights to B.P.*, 186 Wn.2d 292, 313, 376 P.3d 350 (2016).

The Department's obligation to provide all "necessary services" under RCW 13.34.180(1)(d) entails meeting a parent where they are at and providing services in an understandable manner. If the Department has reason to believe a parent has a cognitive impairment, it must make reasonable efforts to investigate the nature of the impairment and then offer tailored services. *In re Parental Rights to M.A.S.C.*, 197 Wn.2d 685, 699, 486 P.3d 886 (2021).[3] Before termination of parental rights can occur, a trial

---

[3] The State appears to argue that it is obliged to accommodate a parent's cognitive needs only if those needs rise to the level of an intellectual or developmental disability. This is incorrect. The Department is obliged to treat all parents as individuals and to provide tailored services, even if the parent is not formally disabled. *See In re Parental Rights to D.H.*, 195 Wn.2d 710, 727, 464 P.3d 215 (2020).

court must determine that the Department has reasonably tailored its services to the

parent's intellectual needs, keeping in mind current professional guidelines for

communicating with individuals with similar needs. *Id*. at 700.

Z.O.'s claim that the Department failed to investigate her intellectual needs

rings hollow. As previously indicated, early in the dependency proceedings Z.O.

submitted to a psychological evaluation from Dr. Debra Brown, who assessed Z.O.'s

intellectual functioning and identified recommended accommodations. There was no

indication from Dr. Brown or any other providers that Z.O. needed further testing or

evaluation. Thus, this is not a case like *In re Parental Rights to I.M.-M.*, 196 Wn. App.

914, 923-24, 385 P.3d 268 (2016), where the Department failed to follow up on the

"apparent likelihood" that the mother was developmentally disabled.

We also disagree with Z.O.'s complaint about the lack of accommodation by

service providers. The problem faced by Z.O. during the dependency proceedings was not

that she was unable to complete court-ordered services. The evidence showed that Z.O.

did well in multiple services, including inpatient treatment, outpatient treatment, and a

parenting program. Rather than struggling to complete services, Z.O.'s problem was that

she refused to engage with certain services, most importantly a DBT program. Z.O. does

not challenge the juvenile court's finding that the Department's social workers deployed

the communication strategies outlined by Dr. Brown in trying to engage Z.O. with services. Yet Z.O. refused to participate, claiming she was tired of participating and did not think she needed more help with her parenting skills. It was this refusal to participate in an essential service that compelled the juvenile court to terminate Z.O.'s parental rights.

The record demonstrates that the Department adequately assessed Z.O.'s cognitive needs and that Z.O.'s failure to engage with services was not attributable to any lack of cognitive accommodation. These being the only challenges raised on appeal, the orders terminating parental rights must stand.

## CONCLUSION

The orders on appeal are affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Pennell, J.

WE CONCUR:

_____     _____
Lawrence-Berrey, A.C.J.          Cooney, J.

10